**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| **v.** | : **3:24-CR-139** |
| | : **(JUDGE MARIANI)** |
| | : |
| **SOLOMON RODRIGUEZ,** | : |
| | : |
| **Defendant.** | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is Defendant Solomon Rodriguez's Motion for a New Trial

(Doc. 241) arising out of a jury verdict finding Defendant Rodriguez, and his co-defendant

Steven Wong, guilty of all six counts of the Indictment filed against them on May 28, 2024.

For the reasons set forth below, the Court will grant in part and deny in part Defendant

Rodriguez's motion.

### II. PROCEDURAL HISTORY

On May 28, 2024, a federal grand jury returned a six-count Indictment in the above-

captioned action, charging Defendants Solomon Rodriguez, Steven Wong, Joushton

Rodriguez, and Mohammed Zeidan with crimes arising out of acts allegedly performed while

members of the Infamous Riders Motorcycle Club:

- o Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951, against Joushton Rodriguez, Solomon Rodriguez, Wong, and Zeidan, beginning on July 22, 2020, and continuing through September 2020 (Count 1).

- o Attempted Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951, against Joushton Rodriguez, Solomon Rodriguez, Wong, and Zeidan, on or about August 29, 2020 (Count 2).

- o Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951, against Joushton Rodriguez, Solomon Rodriguez, and Wong, on or about August 30, 2020 (Count 3).

- o Use of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A) against Joushton Rodriguez, Solomon Rodriguez, and Wong, on or about August 30, 2020 (Count 4).

- o Use of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A) against Joushton Rodriguez, Solomon Rodriguez, and Wong, on or about September 14, 2020 (Count 5).

- o Firearms Conspiracy, in violation of 18 U.S.C. § 924(o), against Joushton Rodriguez, Solomon Rodriguez, Wong, and Zeidan (Count 6).

(Doc. 1).[1]

---

[1] The present action was preceded by several other related cases, beginning in 2021, wherein defendants Alarick Batista, Eric LaSalle, Joshua Marsh, and Rachael Lysakowski all pleaded guilty to the charge of conspiracy to engage in commerce by robbery (see 3:21-cr-271, Docs. 178, 179, 196; 3:22-cr-72,

Trial as to Defendants Wong and Rodriguez commenced on June 10, 2024.[2]  On June 21, 2024, the jury returned verdicts of guilty on Counts 1 through 6 against both defendants.  The jury further answered Jury Interrogatories finding beyond a reasonable doubt as to Wong and Rodriguez that (1) "a firearm was brandished in furtherance of a crime of violence and/or a firearm was brandished during and in relation to a crime of violence, as charged in [Counts 3 and 5] of the Indictment, in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)" (Doc. 149, Jury Interrogatories 4.1 & 5.1) and (2) that "a machinegun was used, carried, or brandished during and in relation to a crime of violence, or a machinegun was possessed in furtherance of a crime of violence, as charged in [Counts 3 and 5] of the Indictment, in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)" (*id.*, Jury Interrogatories 4.2 & 5.2).

On February 6, 2025, Defendant Rodriguez filed the present Motion for a New Trial (Doc. 241) and supporting brief (Doc. 242).

---

Doc. 189) and defendant Cornelius Green pleaded guilty to the use of a firearm in furtherance of a crime of violence (3:22-cr-72, Doc. 69).

[2] Defendant Joushton Rodriguez entered a guilty plea before this Court on May 31, 2024 (*see* Docs. 86, 87) and therefore did not proceed to trial.  The Court also granted Defendant Zeidan's unopposed motion to sever his trial from the trial of the other defendants (Doc. 88).  Following a separate jury trial, Zeidan was found guilty of Counts 1, 2, and 6 of the Indictment on September 5, 2025 (*see* Doc. 348).

## III. STANDARD OF REVIEW

A defendant may move for a new trial pursuant to Federal Rule of Criminal

Procedure 33. Rule 33 provides in pertinent part that "[u]pon the defendant's motion, the

court may vacate any judgment and grant a new trial if the interest of justice so requires. . ."

Fed. R. Crim. P. 33(a).

> "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson,* 302 F.3d 139, 150 (3d Cir. 2002). However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial "only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted." *Id.* (citation and quotation marks omitted). . . . Such motions are not favored and should be "granted sparingly and only in exceptional cases." *Gov't of Virgin Islands v. Derricks,* 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted).

*United States v. Silveus,* 542 F.3d 993, 1004-1005 (3d Cir. 2008). The defendant "bears

the burden of persuading the trial court that the interest of justice requires the grant of a new

trial." *United States v. Ray,* 2016 WL 5787345, at *3 (M.D. Pa. 2016) (quoting *United States*

*v. Hammer,* 25 F.Supp.2d 518, 534 (M.D. Pa. 1998)) (citing *United States v. Amirnazmi,*

648 F.Supp.2d 718, 719 (E.D. Pa. 2009)). "The discretion that federal trial courts exercise

in addressing allegations of juror and prosecutorial misconduct extends to the determination

of whether prejudice has been demonstrated." *United States v. Smith,* 139 F.App'x 475,

477 (3d Cir. 2005) (citing *United States v. Resko,* 3 F.3d 684, 690 (3d Cir. 1993)). Where a

defendant alleges that the cumulative effect of trial errors resulted in an unfair trial, a new

4

trial is required "only when 'the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (quoting *United States v. Hill*, 976 F.2d 132, 145 (3d Cir. 1992)).

## IV. ANALYSIS

Rodriguez's Motion for a New Trial (Doc. 241) requests that the Court order a new trial on all charges or, in the alternative, "vacate the finding of the jury to interrogatory 5.2" (*see* Doc. 242, at 9). Defendant sets forth four bases in support of his motion: (1) the Court "erroneously admitted evidence", specifically a transcript prepared by Agent Michael McKinney; (2) the Court erred in denying a motion to strike a statement made by a witness, Jesse Smith, on cross-examination; (3) the Court erred in admitting the testimony of Michael Plesniak as to site cell analysis; and (4) the Court erred in failing to give a *mens rea* instruction to the jury as to whether Defendant "knew of the characteristics of the firearm that render it a 'machine gun.'"[3] (*See generally*, Doc. 242).

The Court will address these arguments in turn.

---

[3] Defendant Rodriguez's supporting brief only refers to Jury Interrogatory 5.2 of the verdict form when asserting that the Court erred in failing to give a *mens rea* instruction with respect to whether Defendant "knew of the characteristics of the firearm that render it a 'machine gun.'" However, where the same jury instructions and jury interrogatories applied to Counts 4 and 5, and the arguments set forth by Defendant are equally applicable to Jury Interrogatory 4.2, the Court will assume Defendant accidentally omitted reference to Jury Interrogatory 4.2 and will apply its analysis of Defendant's argument to both Jury Interrogatory 4.2 and Jury Interrogatory 5.2.

## A. Transcript Prepared by Agent Michael McKinney

Rodriguez first asserts that the Court erred in admitting a transcript prepared by ATF Special Agent Michael McKinney. (Doc. 242, at 2-3).

On June 11, 2024, Government's Exhibit 7.10, a video found on Cornelius Green's cell phone wherein three voices are heard in a car while surveilling Michael Lydon-Thaxton's residence on September 14, 2020 (hereinafter "surveillance video"), was first identified by Agent McKinney, and conditionally admitted, "subject to connection with later witnesses". (Trial Tr., Test. of McKinney, June 11, 2024, at 100). Agent McKinney then identified Government's Exhibit 7.11 as "a transcription from Government's Exhibit 7.10", stated that he created the transcript, that it accurately reflected the spoken words from the video exhibit, and that he was able to identify the speakers on the video because:

> We have spoken to all the individuals that were involved, we have also listened to hours worth of recorded conversation, and other cooperators who have listened to the video have identified them.

(*Id*. at 102). Government's Exhibit 7.11 was thereafter conditionally admitted, with no objection. (*Id*. at 102-103). The following day, at a side-bar during the testimony of Lydon-Thaxton, Defendant's counsel "reserved the right to object that [the Government did not] have sufficient foundation" to establish that Rodriguez's voice was one of the voices in the video and therefore his name should not have been set forth on the accompanying transcript (Exhibit 7.11). (Trial Tr., June 12, 2024, at 41-42).

6

On June 18, 2024, following the conclusion of the Government's case-in-chief, defense counsel argued that the Government failed to re-call Agent McKinney to sufficiently identify the voice as that of Rodriguez or the basis for his purported knowledge that it was Rodriguez's voice. (Trial Tr., June 18, 2024, at 105-106). Defendant therefore argued that the transcript was "not admissible, [was] prejudicial, and should be stricken." (*Id*. at 106). The Court denied this request. Nonetheless, the Court later clarified that the transcript of the video would not "go" to the jury or be provided to the jury during its deliberations. (*Id*. at 249).

The use of transcripts as a listening aid is a common practice in criminal proceedings and is reviewed for an abuse of discretion, *United States v. DiSalvo*, 34 F.3d 1204, 1220 (3d Cir. 1994). Where a district court provides "a clear and precise limiting instruction to the jury in which it state[s] that the transcript [is] not evidence, but merely an aid to assist in viewing the recording", any "confusion that the transcript could have caused [is] cured through the use of this limiting instruction." *United States v. LaBoy*, 505 F.App'x 182, 184 (3d Cir. 2012) (citing *Gov't of V.I. v. Martinez*, 847 F.2d, 128 (3d Cir. 1988)). *See also*, *DiSalvo*, 34 F.3d at 1220 (finding no abuse of discretion in part because Defendant "fails to point out where he has been misidentified" and "the district court carefully warned the jury on several occasions that the transcript was not evidence.").

7

Here, Rodriguez does not object to the accuracy of what was said as set forth in the transcript at issue. Rather, Defendant's assertion of error relates only to the identification on the transcript of Rodriguez as one of the speakers.

Despite Rodriguez's assertion to the contrary, his voice on the surveillance video was identified by several individuals at trial who were familiar with, and had personal knowledge of, Defendant's voice.

At trial, Eric Lasalle testified that he was a member of the Schuylkill Chapter of the Infamous Ryders motorcycle club, as was Rodriguez. (Trial Tr., Test. of LaSalle, June 13, 2024, at 143-144). When the Government played Exhibit 7.10 for LaSalle, he identified the three speakers in the video, based on their voices, as Rodriguez, Cornelius Green, and Joushton Rodriguez, three members of the motorcycle club. (Trial Tr., Test. of LaSalle, June 14, 2024, at 7-8); (Trial Tr., Test. of LaSalle, June 13, 2024, at 144).

During Isaias Soler's trial testimony, the Government also played the surveillance video and, when asked whether he recognized the voices on the video, Soler identified the same three individuals as did LaSalle, including Rodriguez ("Solo"). (Trial Tr., June 12, 2024, Test. of Soler, at 113-114). When questioned about his familiarity with Rodriguez, Soler explained:

> Q. How many times -- you've already identified an individual you know as Solo. How many times did you hang out with Solo?
>
> A. I didn't really hang out so much with Solo. Solo would just -- he was pretty much -- he was more Chino than anything. I didn't really hang out with Solo at all.

Q. Did you hear him speak when you did hang out?

A. Yeah, I did hear him.

Q. Were you present with him on the morning of September 14th?

A. The morning, yes.

Q. And did you talk with him on the morning of September 14th?

A. Yes.

Q. And is that how you can recognize the voice as him on this video?

A. Yeah.

(*Id.* at 114-115).

Further, Defendant himself, having seen the surveillance video at trial, testified that two of the voices were those of Joushton Rodriguez and Cornelius Green and that the third voice "sounds like my voice." (Trial Tr., Test. of Rodriguez, June 18, 2024, at 224-225).

The testimony of LaSalle, Soler, and Rodriguez, in conjunction with Agent McKinney's identification of the individuals set forth on the surveillance video transcript as the result of having "spoken to all the individuals that were involved, . . . listened to hours worth of recorded conversation, and other cooperators who have listened to the video hav[ing] identified them" (Trial Tr., Test. of McKinney, June 11, 2024, at 102), are sufficient to establish that it was not error to allow the jury to see the transcript at the time the surveillance video was first shown.

9

In addition, at various times throughout the trial, the Court instructed the jury that a transcript is provided as an aid to assist the jurors and that the jury must rely on what they have heard, not read. (*See e.g.*, Trial Tr., June 13, 2024, at 84, 100).

Here, where Rodriguez has not shown any inaccuracies or errors in the transcript, the transcript was shown to the jury merely as a listening aid, was not sent to the jury during deliberations, and where the jury was instructed that transcripts were not evidence and the jury should rely on what they heard, not read, there was no error by this Court. Nor can it be said that Rodriguez suffered prejudice as a result of the jury viewing the transcript of Government Exhibit 7.10 contemporaneously with that surveillance video.[4]

Defendant's assertion of error by the Court in allowing the jury to see the surveillance video transcript (Exhibit 7.11) during trial is therefore without merit.

### B. Statement by Jesse Smith

On June 11, 2024, Jesse Smith, the occupant of the residence that was the subject of the attempted robbery on August 29, 2020, testified on behalf of the Government. At the

---

[4] The Court further notes that there was substantial circumstantial evidence at trial of Rodriguez's participation in the September 14, 2020 robbery, of Lydon-Thaxton's residence, both directly and through a theory of aiding and abetting, including, but not limited to, (1) Soler's testimony as to the events of September 14 prior to the robbery, including that he was with Rodriguez that morning at Wong's home, that Rodriguez and two other individuals took Soler to pick up a key to Lydon-Thaxton's residence, and that Soler immediately gave the key to Rodriguez (Trial Tr., June 12, 2024, Test. of Soler, at 107-110); and (2) Agent Plesniak's testimony that the cell site data for Cornelius Green and Rodriguez indicated that their phones were "in a similar area around the same time[s]" on the afternoon of September 14, including near the location of Wong's residence, then near Lydon-Thaxton's residence, then back at Wong's residence (Trial Tr., June 18, 2024, Test. of Plesniak, at 51-53).

conclusion of counsel for Rodriguez's cross-examination of Smith, the following exchange occurred:

Q. How long did you stay there [at the house] after the robbery?

A. A couple weeks, and then I moved to Saint Clair.

Q. Did you still have your daughter with you?

A. No. You answer that question. What do you think? I just got robbed and you think I'm going to have my daughter back over there?

Q. Well, no, but I don't think that you should be selling drugs from a house where your daughter is living.

A. You're right. There's a lot of people that do a lot worse, like the two Defendants over there.

(Trial Tr., Test. of Smith, June 11, 2024, at 153). Defendants' counsel both moved to strike Smith's response, which was denied by the Court. (*Id.* at 153-154).

Rodriguez now asserts that the Court committed error in denying the motion to strike and that "the testimony was highly prejudicial in that it could have been construed by the jury that Defendants were guilty of the crime charged." (Doc. 242, at 4-5).

Rodriguez argues that Smith's statement was unresponsive to the question asked. (*Id.* at 4). In fact, Smith had already responded "No" to Rodriguez's counsel's question as to whether Smith's daughter was residing at his house following the robbery. Rather than moving to his next question, Defense counsel decided to engage with Smith's follow-up comment that "I just got robbed and you think I'm going to have my daughter back over there" by stating that he "[didn't] think that you should be selling drugs from a house where

11

your daughter is living", which then elicited Smith's comment now at issue.  Thus, defense counsel's decision to engage in testy, and unnecessary, repartee led to the very comment of which he now complains.

Counsel's inappropriate comment, not phrased in question form, was improper and invited Smith's response; the response did not add anything that can reasonably be considered as evidence, prejudicial or otherwise, and was not prejudicial to Rodriguez. Smith admitted on direct examination that in 2020 he was selling marijuana to make money (see Trial Tr., Test. of Smith, June 11, 2024, at 135), testified as to the events of August 29, and repeatedly testified that he did not see any of the individuals in his home that night or know who had entered his home during the attempted robbery (id. at 141, 142, 156). Counsel for both Wong and Rodriguez attempted to impeach Smith's credibility through their focus on Smith's illegal drug activities and his relationship with Joshua Marsh.  They did not ask Smith any questions, nor did Smith provide any answers to properly asked questions, which either tended to incriminate, or exonerate, Rodriguez or Wong in the August 29 attempted robbery.  Smith's solitary comment referencing the Defendants, over the course of approximately 30 minutes of testimony wherein he repeatedly stated that he did not see the individuals in his home on August 29 nor know who attempted to rob him, and never implied that Rodriguez or Wong were responsible for the attempted robbery, is insufficient to establish any prejudice to Rodriguez.  This is particularly the case where there was significant evidence which directly tied Rodriguez to the August 29 attempted robbery,

12

including but not limited to the testimony of ATF Special Agent Michael Plesniak and co-conspirator Alarick Batista. *Cf. United States v. Lore*, 430 F.3d 190, 207 (3d Cir. 2005) ("a single statement by a witness whose testimony spanned five days hardly can be deemed 'pronounced and persistent,' and the record contains strong evidence of the extent of [Defendant's] participation in the illegal schemes.").

## C. Expert Testimony Regarding Site Cell Analysis

On the sixth day of trial, the Government called ATF Special Agent Michael Plesniak as a witness in this case. Following questioning by the Government as to his qualifications, including his relevant experience, training, knowledge, and education, and extensive cross-examination by defendants' counsel, the Court admitted Agent Plesniak as an expert in Cell Site Analysis and Mapping. (*See* Trial Tr., June 18, 2024, at 1-22).

Defendant Rodriguez now argues that the Court "erred in admitting the testimony of Michael Plesniak as to site cell analysis" and specifically that "the United States fail[ed] to establish that the methodology technique of the site cell analysis met the standards for admissibility of expert testimony." (Doc. 242, at 5). Defendant asserts that:

> The evidence offered by the United States in support of the admissibility of Plesniak's testimony failed to establish a basis for its admissibility of the testimony. Significantly, while the United States presented testimony that the work of Plesniak was often checked by another agent in Colorado, but there was no testimony that the methodology itself was ever subjected to independent peer review. Nor, was there any testimony as to the known or potential rate of error of the methodology, the existence and maintenance of standards controlling the methodology's operation, the relationship of the methodology to other reliable techniques, or the nonjudicial uses to which the methodology has been put.

(*Id.* at 6).[5]

The Federal Rules of Evidence, and Rule 702 in particular, assign the trial court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993). Pursuant to Rule 702, governing the admissibility of testimony by expert witnesses:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

---

[5] Rodriguez does not dispute the Government's assertion that he "had been provided the Cell Site Analysis created by Special Agent Plesniak for over a year before trial, original expert notice months before trial, and a final supplemental expert notice on weeks prior to trial" (Doc. 257, at 56 n. 6). (*See also, id.* at 6 n. 3). Despite being provided with significant notice as to the contents of Agent Plesniak's expected testimony, and the basis therefor, at no time prior to trial did Defendant seek a *Daubert* hearing. As the Supreme Court has made clear, when parties dispute the basis of an expert's conclusions that are otherwise admissible under Rule 702 and other applicable Rules of Evidence, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. Despite having all of the relevant information well-before trial, Defendant made the tactical decision to wait until the Government called Agent Plesniak to the stand to object to his admission as an expert. In addition, despite the ability to do so, Defendant did not attempt, prior to trial, to compile evidence to contradict or place at issue any of Agent Plesniak's expected testimony.

The inquiry under Rule 702 is "a flexible one." *Daubert*, 509 U.S. at 594. The overarching subject of the Rule is "the scientific validity and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission." *Id.* at 594-595. The Court of Appeals for the Third Circuit has explained that:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. [*In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741-743 (3d Cir. 1994) ("*Paoli II*")] (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, (1993)). Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." *Id.* Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his on her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." *Paoli II*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786). Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." 509 U.S. at 591-92.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-405 (3d Cir. 2003).

Prior to being admitted as an expert at trial, Agent Plesniak testified as to his formal education and work history. He explained the field of "Cell Site Analysis and Mapping" as follows:

> . . . [S]o most people carry a cell phone around, and the three major cell providers, T-Mobile, AT&T and Verizon, operate a cellular network, and each of those cellular networks are comprised of cell sites, and they're the physical locations of antenna that your cell phone connects to, when you're using it.

> So those companies, as part of their business records, they maintain a database, where they save the records to see when people are using phones, whether it's voice, text messages or applications, they maintain a database just to check on it to make sure their network is working properly, make sure there are not dropped calls, things like that.
>
> So Cell Site Analysis, we can get those records in law enforcement, and we can look and see where a phone is, based on, generally, based on which cell sites it's connecting to.

(Trial Tr., Test. of Plesniak, June 18, 2024, at 6).

Agent Plesniak further explained his training in cell site analysis to the jury on direct examination:

> Q. You had testified that you became an expert in Cell Site Analysis. Can you explain to the jury what your specific training is and educational background is for that area?
>
> A. Yes, so when I was at the Philadelphia Field Division, there was a need for a Cell Site Expert to do Cell Site Location Analysis, and I went to do Cell Site Analysis.
> . . . .
> So there was a need in the Philadelphia Field Division for someone to learn Cell Site Analysis, so I consulted with some other experts in the field, and I found a training program through a company that was formerly called ZetX, it's now part of LexisNexis called Accurint or TraX, and they had a basic course, a basic 40-hour course that I took in 2018.
>
> Then, I took a Subject Matter Expert 40-hour course, and then I followed up, again, I think, 2021-2022 -- sorry -- 2022, I followed up and took the Subject Matter Expert course, again, to kind of refresh and catch up with newer technologies.

(*Id.* at 5-6).  He testified that he had "done hundreds of mappings [and] looked at, maybe, up to thousands of records, hundreds of records, maybe, up near the thousands of records, probably, worked on between 50 and 100 cases." (*Id.* at 7).  He has assisted the ATF,

Philadelphia Police Department and "a few smaller local municipalities in New Jersey" with Cell Site Mappings and Analysis. (*Id.*).

With respect to TraX specifically, Agent Plesniak testified that he has been trained in this program and that it is generally accepted in his field. (*Id.*).

Agent Plesniak admitted that he did not know whether the algorithm used by TraX had been peer-reviewed by anyone in the scientific community and that he was unaware what mathematical, scientific or statistical principles the TraX program uses to come up with the formula or algorithm that produces the mapping. (*See id.* at 9, 10, 11). Nonetheless, he explained:

> When I did the initial training with ZetX and we were in the initial training, they pull up -- you can go to their website still, actually, and there's a list of scientific standards that really goes into detail about antennas and propagation and horizontal planes. That's really beyond the scope of what I need to do for my analysis, so all that stuff is on their website, scientifically, and I can pull up the articles for you, if you wanted, but I don't go that deep to get into the scientific portions of antennas or radio waves or anything like that.

(Trial Tr., Test. of Plesniak, June 18, 2024, at 10).[6] Although Agent Plesniak admitted that he could not explain how the algorithms worked "on the back end", he stated that:

> . . . the accuracy of the program was tested by the company, and what they do is what's called a drive test, where they, actually, drive around on the streets with a device that tells the program which tower the device is connecting to, as if it was a cell phone.

---

[6] Agent Plesniak also stated that Sy Ray was the owner of ZetX, which developed TraX, and that Ray "taught portions of the first class" that Agent Plesniak took on this subject. (Trial Tr., June 18, 2024, at 8-9).

17

> So they drove around the streets, they've done, I think -- the last I saw, from training, was over, like, one and a half million records -- and they've driven around the streets to make sure that their ranges, their mapping is accurate, and they're over 90 percent accuracy, is what they report.

(*Id*. at 13-14).

> Agent Plesniak further explained:

> I know that when I receive the records, I do spot checks. So when I receive the cellular records, it's a raw data, sometimes, in a text file, sometimes, in a spread sheet, depends on the company, and to make sure -- it would be impossible for me to go through thousands of lines of records -- but to make sure that the computer system isn't making things up, I spot-check it, I go in and manually map from the GPS coordinates in Google Earth and make sure that the cell site where they're mapping it is, also, where they're at in the records.

(*Id*. at 9-10). He later re-iterated his method of checking the accuracy of the data:

> . . . I go in and spot-check the records, I make sure, and I will take -- you know, usually, about a dozen per case, so for each of these events, I probably took about a dozen per phone, randomly throughout, throw it into Google Earth to make sure the cell site location is what matches with the records and compare it to what the TraX program mapped, and I found no inaccuracies when I did that. I can't remember exactly how many records I did for this case, but I found no inaccuracies, at all, when I did that for this entire case.

(*Id*. at 10-11; *see also, id*. at 16 (stating that he uses this spot-check approach to verify the analysis of the locations "every time" he analyzes records.)). When asked, specifically, what he does when he receives call detail records, in order to perform a Cell Site Analysis and Mapping, Agent Plesniak testified:

> So, first, I review the records, manually, I open them up, just look at them, make sure the records look like what I would expect to see from T-Mobile, Verizon or AT&T. The TraX program is a web-based service, so I go to their website, it's kind of like a drag and drop, I drag the files in that are relevant, and the TraX program creates a Google Earth file.

> Once I have that file, I'm able to open their product in Google Earth, I go back to the original records, like I said, I spot-check, so I'll go down about a dozen, just pick random lines, I will take the geo coordinates of the cell site location records, the CDR's that we get from the companies have GPS coordinates in them.
>
> So I will take those GPS coordinates, plug them into Google, I will zoom down in Google, and, say, Okay, there's a cell site here, you can see it right here in Google Earth, now, let me open up the ZetX or whatever, TraX, whichever way you want to refer to it, I'll open that file, go to that time where it says it's using that cell site, and I'll compare that to what I manually mapped.

(*Id.* at 15-16). He clarified the purpose and application of TraX as follows:

> . . . So when I talk about the spot check, again, that's me going in -- so you have to understand that the TraX program, the ZetX program, it's just a visualization of the records, it's just a way to visualize that we can see on a map so it's easier to explain to you. The records, kind of, stand for themselves.
>
> A lot of what I testified to is directly based on the records that are provided by the cellular service providers, and, then, the TraX program just creates a visualization for that. So I just want to make sure, when I'm doing my work, that the visualizations are accurate, so when I do a spot check -- again, I can't go through a thousand lines of cell phone data for each phone -- but I can pick random ones throughout, as I go down, and just make sure, Yes, this is lining up, this is lining up, okay, and if I find an inaccuracy, I have to deal with that. I did not find any inaccuracies in this case.

(*Id.* at 19-20; *see also, id.* at 22 ("Again, the [cell site] programs just create a visualization,

that's all they do. The records are the records.")).

Having been admitted as an expert in Cell Site Analysis and Mapping, at trial, Agent

Plesniak testified as to the estimated cell phone locations of Rodriguez, Alarick Batista, Eric

LaSalle, Joushton Rodriguez, and Cornelius Green, where relevant, at certain times of the

days/nights of August 29, August 30, and September 14, 2020. In doing so, he presented a

PowerPoint exhibit visually demonstrating shaded areas of the approximate location of these individuals' phones within a certain cellphone coverage area. Agent Plesniak also presented, and testified as to, the raw data that he received from the cell phone carriers and how he used this data in determining the approximate locations of these individuals' phones both through the TraX program and through independent spot-checking using this data.

Agent Plesniak began by explaining to the jury the definition of a "cell site":

So cell sites are part of a cellular network, like I said earlier, a cell cite [sic] is an individual physical location where the antenna is, so when you're walking around, carrying your cell phone, your cell phone is constantly communicating with the network trying to find the best signal to connect to, then, when you go to use your phone, text message data and app, surf the web, make a phone call, your phone now connects to that radio signal, that antenna signal, from the cell site, and that's how you get service on your phone.

(Trial Tr., Test. of Plesniak, June 18, 2024, at 24). After providing several examples of cell sites and the various antennae that can be used in determining cell phone location, he explained that the range of a cell site "can range from a couple hundred meters to 20 or 30 miles", depending on a number of factors, including the surrounding terrain, such as hills, mountains, and buildings and the type of cell sites in the area. (*Id*. at 26; *see also*, *id*. at 59).

In addressing how TraX works, Agent Plesniak testified that "the TraX program uses what's called cellular frequency" or "cell site frequency" "which is the amount of cell sites in an area." (*Id*. at 28-29). He acknowledged that the program provides "just an estimate, . . . it uses cell site frequency, the amount of cell sites in the area, and takes a percentage of

that, because this is how far we expect that cell site to cover, because if it covered any more, it would be using the other cell site." (*Id.* at 29). He further acknowledged that a cell phone may not connect to the geographically closest cell site, but rather, may connect to "the best signal." (*Id.*). Nonetheless, the cell phone would have to be in the actual range of a cell site in order to connect with it. (*Id.* at 30). Agent Plesniak thus admitted that he is unable to "pinpoint the exact location of a phone." (*Id.*). Throughout Agent Plesniak's testimony, he repeatedly made clear that the areas in which he was testifying that the cell phones of one or more individuals were present were approximations and that he could not state with precision the exact location of the cell phones. (*See e.g., id.* at 36 (showing a shaded area illustrated on his PowerPoint slide explaining that this is "an estimate" and that he was "by no means . . . testifying that the phone is definitely within that blue shape, it's somewhere near that blue shape."); *id.* at 52-53 (when asked whether the PowerPoint demonstrated that two individuals' cell phones were traveling together, responding that "it's consistent with what I would expect to see for phones traveling together [but i]t's not accurate enough for me to say both phones were in the same car...")).

Here, Defendant Rodriguez challenges the admissibility of Agent Plesniak's testimony, arguing that "there was no testimony that the methodology itself was ever subjected to independent peer review" and there was no testimony as to the known or potential rate of error of the methodology, the existence and maintenance of standards controlling the

methodology's operation, the relationship of the methodology to other reliable techniques, or the nonjudicial uses to which the methodology has been put." (Doc. 242, at 6).

An expert's testimony is reliable if it "is based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Schneider ex rel. Estate of Schneider*, 320 F.3d at 404 (internal citation and quotation marks omitted). "Yet admissibility is not based on whether an expert's opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research. Rather, the court looks to whether the expert's testimony is supported by good grounds." *UGI Sunbury, LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834 (3d Cir. 2020) (internal citation and quotation marks omitted). "This inquiry applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion." *Cohen v. Cohen*, 125 F.4th 454, 462 (3d Cir. 2025) (internal citation and quotation marks omitted).

To determine whether the expert's testimony is supported by "good grounds," *Daubert's* reliability analysis requires a court to consider, among other things: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology;

and (8) the non-judicial uses to which the methods have been put." *In re Paoli*, 35 F.3d at 742 n.8. "However, *Daubert* did not set out a definitive checklist or test, and no single factor was deemed dispositive." *Mercurio v. Louisville Ladder, Inc.*, 2018 WL 4088059, at *4 (M.D. Pa. 2018) (citing *Daubert*, 509 U.S. at 593). "While a litigant has to make more than a prima facie showing that his expert's methodology is reliable", the Third Circuit has "cautioned that the evidentiary requirement of reliability is lower than the merits standard of correctness." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 247 (3d Cir. 2008) (internal citation and quotation marks omitted). The *Daubert* standard "is not intended to be a high one, nor is it to be applied in a manner that requires the plaintiffs to prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessment of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (internal citation and quotation marks omitted).

Despite Rodriguez's arguments, the opinions of Agent Plesniak provided at trial, and the underlying methodology used, were reliable and based on "good grounds."

Agent Plesniak's trial testimony demonstrated the necessary knowledge, application, and reliability of the TraX program. Agent Plesniak testified that he had consulted with "experts in the field" of cell site analysis, which resulted in him choosing the TraX training program and that TraX is a program that is generally accepted in his field of cell site analysis. He explained how the manufacturer of TraX had tested its cell site analysis

23

program, the manner in which the program generated its "visualization of the records", the

necessary data to be inputted into the program, and his personal knowledge with respect to

how to properly use this program. He further testified as to his own measures undertaken to

"spot check" the visualizations produced by the TraX program and to ensure the accuracy of

these visualizations.[7]

Although Rodriguez additionally argues that the methodology of the software used

by Plesniak "was [n]ever subjected to independent peer review" and the Government failed

---

[7] To the extent that Defendant Rodriguez's argument can also be understood as challenging Agent Plesniak's admission as an expert on the basis that he could not fully explain the methodology underlying TraX, such knowledge is not required under Rule 702 or *Daubert*. In *United States v. Morgan*, 45 F.4th 192 (D.C. Cir. 2022), the D.C. Circuit rejected Defendant's argument that the District Court had improperly admitted expert testimony by an FBI Agent to opine as to the locations of the defendant and another individual on the day at issue. Defendant raised a number of issues in support of this argument, including "challeng[ing] the reliability of [Agent] Horan's testimony on the ground that Horan could not explain the computer algorithms that processed the drive-test data and generated the coverage maps." *Id.* at 203. The Circuit Court reasoned:

> [W]e have never held that Rule 702 requires an expert to have a sophisticated understanding of the software underlying her technological tools. *Cf. United States v. Chiaradio*, 684 F.3d 265, 278 (1st Cir. 2012). If we required expert witnesses to have detailed knowledge of the software underlying their testimony, they could almost never testify on matters related to proprietary technology. For example, "anyone who testifies using any basic software such as Excel ... to provide financial analysis[ ] would be required to be an expert in the algorithms by which Excel codes its formula and calculations." [*United States v. Nelson*, 533 F.Supp. 3d 779, 798 (N.D. CA.)] (citation and quotation marks omitted).

> Federal Rule of Evidence 702 does not compel that result. The touchstone of Rule 702 is reliability. Even if Horan could not explain the inner workings of the software that generated the drive-test maps, he could assure the reliability of his drive test and the maps it generated through other means. Horan was indisputably qualified to testify about a technological tool that has earned wide acceptance in a relevant industry, and he used the tool in its customary manner. His inability to explain a proprietary algorithm did not pose a categorical bar to a finding of reliability.

*Id.*

to show what "nonjudicial uses to which the methodology has been put" (Doc. 242, at 6), this factor alone is not dispositive. As noted by the Sixth Circuit, citing a District Court within the Middle District of Pennsylvania, in specifically addressing the TraX program:

> [A]s the Supreme Court has noted, it is sometimes not surprising that peers have not reviewed a given technique if the relevant issue has never "interested any scientist." *Kumho Tire* [*Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999)]. And, as another court has noted, TraX might have few (if any) uses outside of "criminal investigations" to make it worthy of a scientist's time. *United States v. White*, 2023 WL 3161953, at *4 (M.D. Pa. Apr. 27, 2023).

*Reynolds*, 86 F.4th at 347.

Furthermore, Agent Plesniak's testimony at trial was narrowly tailored in so far as it was limited to the general location of the cell phones of Rodriguez and other alleged co-conspirators. Agent Plesniak did not purport to know the precise location of these individuals, but only testified as to the area in which these individuals' cell phones were located in relation to the various cell sites. A number of courts have found that this approach reduces concerns regarding the reliability of an expert's testimony as to cell phone data and satisfies *Daubert*'s requirements. *See e.g. United States v. Gatson*, 744 F.App'x 97, 102 (3d Cir. 2018) (affirming District Court's analysis and conclusion regarding the reliability of FBI Special Agent's testimony, in part, because the expert was "only testifying to 'the general location of where Gatson's cell phone would have to be ... to utilize certain cell sites.'") (quoting *United States v. Gatson*, 2015 WL 5920931, at *2 (D.N.J. 2015)). *See also, United States v. Reynolds*, 86 F.4th 332, 347 (6th Cir. 2023) (acknowledging that "courts have cautioned that an antenna-mapping technique might raise

*Daubert* concerns if the expert overpromises on the technique's precision by misleadingly suggesting that the data pinpointed a defendant to a precise location – like GPS data can do" but collecting case law demonstrating that "when considered from a high level of generality, the function that TraX performs has general (perhaps universal) acceptance . . . [and c]ourts and scientists alike have widely accepted the common practice of determining a cellphone's general location – with critical emphasis on general – by identifying the specific antenna that the phone connected to at a specific time.") (internal citations and quotation marks omitted); *United States v. Hill*, 818 F.3d 289, 298 (7th Cir. 2016) ("In his trial testimony, Agent Raschke emphasized that Hill's cell phone's use of a cell site did not mean that Hill was right at that tower or at any particular spot near that tower. This disclaimer saves his testimony. Historical cell-site analysis can show with sufficient reliability that a phone was in a general area, especially in a well-populated one. It shows the cell sites with which the person's cell phone connected, and the science is well understood.").

Having found that Agent Plesniak was properly qualified as an expert and that his testimony was reliable, it is evident that his testimony was both highly relevant to the issues to be decided by the jury and that it was helpful. Agent Plesniak testified as to the locations of the cell phones of Rodriguez and several of co-conspirators on days relevant to the robberies, or attempted robbery, at issue. This testimony further aided the jury in assessing the credibility of not only Batista and LaSalle, but also of Rodriguez when he testified in his own defense.

26

For these reasons, the Court will deny Rodriguez's motion for a new trial on the basis that the Court erred admitting Agent Plesniak's testimony (Doc. 242, at 5-6).

**D. Use of a Firearm in Furtherance of a Crime of Violence – Counts 4 and 5**

Finally, Defendant Rodriguez requests that portions of his convictions in Counts 4 and 5 of the Indictment be vacated, specifically Jury Interrogatories 4.2 and 5.2 relating to the use of a machinegun during the August 30, 2020, robbery at Joseph Lumia's residence (Count 4) and during the September 14, 2020, robbery at Michael Lydon-Thaxton's residence (Count 5).

Counts 4 and 5 of the Indictment charged Rodriguez, and other defendants, with Use of a Firearm in Furtherance of a Crime of Violence, specifically, that the defendants "did knowingly brandish, carry, and use firearms, including a machinegun, during and in relation to, and possess firearms in furtherance of, a crime of violence . . . and did aid and abet the same", all in violation of 18 U.S.C. § 924(c)(1)(A), (B)(ii), and *Pinkerton*. (Doc. 1, at 4-6).

The Court's jury instructions as to these two counts incorporated the parties' requested instructions, the relevant Third Circuit Model Criminal Jury Instructions and associated Commentary, and the statutory definition of "machinegun" as set forth in 26 U.S.C. § 5845(b). The verdict form addressing Counts 4 and 5 asked the jury, as to each count and as to each Defendant, whether it found beyond a reasonable doubt that the "Defendant possessed a firearm in furtherance of a crime of violence and/or used or carried a firearm during and in relation to a crime of violence . . . all in violation of 18 U.S.C. §

27

924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)". (Doc. 149, at 5, 8). The verdict form also included two Jury Interrogatories following both Counts 4 and 5, asking the jury, as to each defendant, whether (1) "a firearm was brandished in furtherance of a crime of violence and/or a firearm was brandished during and in relation to a crime of violence, as charged in [Counts 3 and 5] of the Indictment, in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)" (Doc. 149, Jury Interrogatories 4.1 & 5.1) and (2) whether "a machinegun was used, carried, or brandished during and in relation to a crime of violence, or a machinegun was possessed in furtherance of a crime of violence, as charged in [Counts 3 and 5] of the Indictment, in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)" (*id.*, Jury Interrogatories 4.2 & 5.2).

On June 20, 2024, prior to the presentation of the parties' closing arguments, the Court held a charge conference with the parties to address the Court's jury instructions and verdict form. At the conference, no party had any objection to the Court's jury instructions. (*See* Trial Tr., June 20, 2024, at 2-6). However, with respect to the verdict form, counsel for Defendant Wong, addressing Jury Interrogatories 4.2 and 5.2, stated:

> What the jury has to find in regard to a machine gun, our belief is that Mr. Wong knew that a machine gun would be used or that it was reasonably foreseeable under *Pinkerton* that a machine gun would be used.
>
> So our proposal on the interrogatories would be that they are Defendant specific and that they would ask the jury unanimously finds beyond a reasonable doubt that Steven Wong knew, or that it was reasonably

28

foreseeable to Steven Wong that a machine gun would be used, carried, or brandished, et cetera.

(*Id.* at 2).  The Government objected, noting that it believed "that adds additional elements of crime that are not found in law." (*Id.* at 3).  The Government added that "[w]e proved [Defendants] had the mens rea to commit 924(c), and we also proved that the firearm in question was a machine gun, there is not an additional mens rea element of knowing it was a machine gun." (*Id.* at 3-4).  In response, Wong's counsel hypothesized:

> I think, Your Honor, if I can add, I think the issue is, under the 924(c), you know, the Government put on evidence that there were both handguns used in the commission of these robberies and a machine gun used in the commission of the robberies.
>
> So if a jury -- a jury could reasonably find that the Government has established that Steven Wong knew or reasonably foresaw that a handgun would be used and convict him of the 924(c), and yet still find that he did not know or that it was not reasonably foreseeable that a machine gun would be used, and to get that increased 30-year mandatory minimum penalty, I do think the jury has to find specific as to the machine gun, that it was reasonably foreseeable or that he had knowledge.

(Trial Tr., June 20, 2024, at 4).  At no time did any party present case law or other legal authority to support their respective positions.  Although the Court made the Jury Interrogatories specific as to each defendant as requested by Defendant Wong, the Court declined to make the requested change to Jury Interrogatories 4.2 and 5.2 as to whether

each defendant knew, or could reasonably foresee, that a machinegun would be used in the crime of violence.[8]

Defendant Rodriguez now requests that the Court vacate the jury's verdict as to Jury Interrogatories 4.2 and 5.2, based on the absence of a *mens rea* charge by the Court as to each Defendant's knowledge of the characteristics of the machinegun. (Doc. 242, at 8-9).

Section 924(c) of Title 18 provides in relevant part:

> (1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous

---

[8] The Court also notes that counsel for neither Rodriguez nor Wong previously raised this potential issue prior to the charge conference. Following the Government's case-in-chief, Defendant Rodriguez made "a general demurrer to the evidence" and, in relevant part as to the machinegun, argued:

> On the question of the lack of evidence on the machinegun, I think it's very important to note, I remember the evidence that this robbery was -- that these guns were recovered in January, and I think that they were -- maybe, it was almost a year before they were turned over to the expert. There's no proof that when they were in the possession, in September or August of 2020, having been seized in a car stop in 2021, there's no evidence that this gun had been altered, at the time of these crimes. It could have been altered between September and the time it was eventually seized by the Government.
>
> In addition, I think it's very important to note they did not prove a chain of custody, from the time it was taken by the Government, in January, and the time it was, eventually, examined, so I think you have to have all that other time excluded. I'm not making any accusations, but when you have physical evidence and the condition of that evidence is important, when you have evidence that you have to show that the evidence you're introducing is in the same condition it was when the crime was committed, you do that by chain of custody.
>
> And there's no evidence of the chain of custody of this rifle, from January when it was picked up, until the day it was examined. . .

(Trial Tr., June 18, 2024, at 85-87). Defendant Rodriguez did not argue, or suggest, that a defendant's knowledge of the type of firearm used was an element of the offense, nor that the Government had failed to adduce evidence of Rodriguez's knowledge of the machinegun.

weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime --

    (i) be sentenced to a term of imprisonment of not less than 5 years;

    (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

    (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

(B) If the firearm possessed by a person convicted of a violation of this subsection--

. . .

    (ii) is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.

18 U.S.C. § 924(c)(1)(A), (B)(ii).

In *United States v. O'Brien*, the Supreme Court addressed whether "the fact that the firearm was a machinegun is an element [of § 924(c)] to be proved to the jury beyond a reasonable doubt or a sentencing factor to be proved to the judge at sentencing." *United States v. O'Brien*, 560 U.S. 218, 221 (2010). Although the Court acknowledged that "there are some arguments in favor of treating the machinegun provision as a sentencing factor", it ultimately concluded that the machinegun provision in § 924(c)(1)(B)(ii) is an element of the offense. *Id.* at 235. However, the Supreme Court explicitly declined to express any position as to whether "a defendant who uses, carries, or possesses a firearm must be aware of the weapon's characteristics." *Id.* at 222.

Since the issuance of *O'Brien* in 2010, most Circuit Courts, including the Third Circuit, have not addressed the issue left open by the Supreme Court: whether §

31

924(c)(1)(B)(ii) contains an implicit *mens rea* requirement. The three Circuits that have decided this issue in precedential opinions have reached different conclusions. Specifically, the Eleventh Circuit Court and D.C. Circuit Court have held that the machinegun element of § 924(c)(1)(B)(ii) does not require the Government to prove that the defendant knew that the firearm at issue was a machinegun, whereas the First Circuit has held that the Government is required to prove that the defendant knew the firearm at issue had the characteristics of a machinegun. *See United States v. Haile*, 685 F.3d 1211 (11th Cir. 2012); *United States v. Burwell*, 690 F.3d 500 (D.C. Cir. 2012); *United States v. Pérez-Greaux*, 83 F.4th 1 (1st Cir. 2023). *See also, United States v. Algarin-Torres*, 2025 WL 1088181, *1 (3d Cir. 2025) ("We have not decided whether § 924(c)(1)(B)(ii) contains an implicit mens rea requirement. Nor has the Supreme Court. . . . And our sister courts that have addressed the question have reached divergent results.") (internal citation omitted) (collecting cases).

The Eleventh Circuit first addressed the *mens rea* issue post-*O'Brien* in 2012. In *United States v. Haile*, the defendants were convicted at trial of drug related offenses as well as knowing possession of several firearms, including a machinegun, in conjunction with the drug-trafficking offenses. At sentencing, the District Court noted that Defendants' conviction under § 924(c)(1)(A) and (B)(ii) carried a mandatory minimum sentence of 30-years. Defendants appealed, raising a number of issues, including in relevant part "that the district court committed reversible error by failing to instruct the jury that, to establish a conviction for machine-gun-possession, the jury must find that (1) the defendant possessed

32

a machine gun and (2) knew the firearm was a machine gun when he possessed it." *Haile,*

685 F.3d at 1218.  The Eleventh Circuit rejected this argument, stating:

> In [*O'Brien*], the Supreme Court held that the fact that a firearm was a machine
> gun was an element of the § 924(c)(1)(B)(ii) offense rather than merely a
> sentencing enhancement. *O'Brien,* 130 S.Ct. at 2180. In other words, the
> government must prove beyond a reasonable doubt that the firearm in question
> was actually a machine gun. *Id.* at 2175-80. *O'Brien* did not hold that a
> defendant's knowledge that a firearm is a machine gun must also be so proved.
> And nothing in the text of § 924(c)(1)(B)(ii) makes knowledge of the firearm's
> characteristics an element of the offense.

*Id.*  The Circuit Court further reasoned:

> Indeed, this court has held that § 924(c)(1)(B)(ii) "does not require proof of
> particularized knowledge of the weapon characteristics." *United States v.
> Ciszkowski,* 492 F.3d 1264, 1269 (11th Cir. 2007) (internal quotation marks
> omitted). Although *Ciszkowski* construed § 924(c)(1)(B)(ii) as a sentencing
> enhancement – a construction that the Supreme Court in *O'Brien* rejected –
> *O'Brien* did not expressly overrule, nor did it even mention, *Ciszkowski.* Thus,
> under our prior-precedent rule, *Ciszkowski*'s holding that "proof of
> particularized knowledge of the weapon characteristics" is not required remains
> controlling.

*Id.*

Soon after the issuance of *Haile,* the D.C. Circuit, *en banc,* reached a similar

conclusion.  In *United States v. Burwell,* the Circuit Court addressed "only a single legal

question . . . : whether 18 U.S.C. § 924(c)(1)(B)(ii), which imposes a mandatory thirty-year

sentence for any person who carries a machinegun while committing a crime of violence,

requires the government to prove that the defendant knew the weapon he was carrying was

capable of firing automatically."  690 F.3d at 502.  The D.C. Circuit answered this question

in the negative, explaining:

33

> Section 924(c)(1)(B)(ii) poses no danger of ensnaring "an altar boy [who made] an innocent mistake," [*United States v. Harris*, 959 F.2d 246, 259 (D.C. Cir. 1992)] because the government must first prove the defendant is guilty of either drug trafficking or a violent crime, and must further prove that the defendant intentionally used or carried a firearm, or intentionally possessed a firearm, during or in furtherance of that offense. *Id.* There is thus no risk of unfairness because the defendant "knows from the very outset that his planned course of conduct is wrongful." *United States v. Feola,* 420 U.S. 671, 685, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).

*Id.* at 507. The D.C. Circuit Court further rejected any characterization of its decision as imposing "strict liability", reasoning that "the government is still required to establish *mens rea* with respect to the predicate crime and with respect to the use, carrying, or possession of the firearm." *Id.*; *see also, id.* at 514 (§ 924(c) is not a strict liability crime where "the government is required under this statute to first establish *mens rea* with respect to the predicate offense, and then to prove that the defendant intentionally used, carried, or possessed a firearm in the course of that crime.").

The Court additionally found that:

> the argument that the machinegun provision in § 924(c)(1)(B)(ii) must carry an implicit *mens rea* requirement simply because the [Supreme] Court has construed it as an offense element ignores the practical distinction between proving objective facts and subjective mental states. The kind of weapon used, like the type and quantity of drug, is a physical fact, readily susceptible to proof beyond a reasonable doubt. As such, Congress could well intend such factors to be offense elements without intending to include an implicit, subjective *mens rea* requirement.

*Burwell*, 690 F.3d at 509.

Despite a majority agreement, the D.C. Circuit Court's decision displayed significant fracture in opinion among the judges and was only narrowly reached. Of the eight judges

sitting *en banc* in *Burwell*, three judges dissented (Judges Rogers, Kavanaugh, and Tatel). The concurring opinion of a fourth judge called the case "exceedingly close", expressed agreement with several of the dissent's arguments, and ultimately "concur[red] with the majority because of the stability principle inherent in our doctrine of *stare decisis*." *Burwell*, 690 F.3d at 517 (Sentelle, J., concurring).

Judge (now Justice) Kavanaugh, joined by Judge Tatel, dissented from the majority opinion in *Burwell*. This dissent reviewed many of the same Supreme Court cases as the majority, including, but not limited to, *Morissette v. United States*, 342 U.S. 246 (1952), *United States v. U.S. Gypsum Co.,* 438 U.S. 422 (1978), *Staples v. United States,* 511 U.S. 600 (1994), *United States v. X-Citement Video, Inc.,* 513 U.S. 64 (1994), *Flores-Figueroa v. United States,* 556 U.S. 646 (2009) and *Dean v. United States,* 556 U.S. 568 (2009). However, Judge Kavanaugh's review of these cases, and other legal precedent, led to a different conclusion. "In its long line of mens rea precedents, the [Supreme] Court has applied the presumption of mens rea not just to statutes that are silent about mens rea. . ., but also to statutes that contain a mens rea requirement for one element but are silent or ambiguous about mens rea for other elements." *Burwell*, 690 F.3d at 535 (Kavanaugh, J., dissenting).

For example, Judge Kavanaugh reasoned that:

Several factors strongly reinforce the presumption of mens rea here. The Supreme Court has emphasized the particular importance of the presumption when penalties are high – a characterization the Court has applied to statutory maximum sentences of one year's imprisonment. Here, the punishment is

dramatically more severe than that – 20 extra years of *mandatory* prison time. Under the Supreme Court's precedents, that heavy sanction strongly reinforces the presumption of mens rea. Moreover, the Supreme Court has already applied the presumption to the automatic character of a gun. In *Staples v. United States,* 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), the Court addressed a statute that prohibited possession of an unregistered automatic gun and imposed a maximum sentence of 10 years' imprisonment. The statute was silent about mens rea. The Court held that the Government had to prove that the defendant knew the automatic character of the weapon. There is no good reason for a different result in this case: Here, too, the Government should have to prove that the defendant knew the automatic character of the weapon.

*Id.* at 528.  Judge Kavanaugh later repeated the impact of the Supreme Court's decision in

*Staples* on how a court should interpret § 924(c):

The Court's decision . . . in [*Staples*], is particularly instructive here. The statute at issue in *Staples* provided only: "It shall be unlawful for any person ... to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record...." 26 U.S.C. § 5861 (1994); *see* 511 U.S. at 605, 114 S.Ct. 1793. The statutory definition of "firearm" included automatic weapons, but not semiautomatic weapons. *See* 511 U.S. at 602-04, 615, 114 S.Ct. 1793. The statute contained no express mens rea requirement.

The question in *Staples* – very similar to the question in our case – was whether the Government had to prove that the defendant knew the gun was an automatic. The Court said yes. The Court cited "the background rule of the common law favoring *mens rea*" and noted that the rule applies to statutory criminal offenses. *Id.* at 605-06, 619, 114 S.Ct. 1793. According to the Court, "some indication of congressional intent" to dispense with mens rea is necessary before a court will find strict liability. *Id.* at 606, 114 S.Ct. 1793. The Court stated: "Silence does not suggest that Congress dispensed with *mens rea*" for the automatic weapon element. *Id.* at 619, 114 S.Ct. 1793. The Court also pointed out that the sentence involved – a statutory maximum of 10 years' imprisonment – further supported requiring proof of mens rea. *See id.* at 616-19, 114 S.Ct. 1793. As for what *level* of mens rea was required, "knowledge" of "the facts that make his conduct fit the definition of the offense" would suffice "to establish *mens rea.*" *Id.* at 608 n. 3, 114 S.Ct. 1793. Therefore, "to obtain a conviction, the Government should have been required to prove that" the defendant "knew of the features of his AR-15 that brought it within the scope of

the Act"- that is, knew that the gun was an automatic. *Id.* at 619, 114 S.Ct. 1793.

*Id.* at 535.

Having "established that the presumption of mens rea applies to each element of the offense", Judge Kavanaugh explained that "[t]o use the presumption of mens rea correctly, we must keep in mind a critical distinction: The presumption of mens rea applies to elements of the offense, but *not* to sentencing factors." *Id.* at 538 (emphasis in original). Relying on *O'Brien*'s holding that a firearm's automatic character is an element of the § 924(c) offense, he therefore reasoned that, although the "majority opinion avoids the presumption of mens rea by treating the automatic character of the gun as if it's a sentencing factor rather than an element of the offense", instead, "because the presumption of mens rea applies to each element of the offense, the presumption of mens rea applies here [and w]e therefore must presume that the Section 924(c) offense requires the Government to prove that the defendant knew his gun was automatic." *Id.* at 541.

Judge Kavanaugh acknowledged that "[o]f course, the presumption of mens rea is a presumption; it thus may be overcome by a plainly contrary congressional intent, as revealed in the statutory text or context" but determined that "[h]ere, the presumption of mens rea is not overcome." *Burwell*, 690 F.3d at 547.

> To begin with, three aspects of Section 924(c) strongly *reinforce* the presumption of mens rea: the severity of the additional sentence for carrying an automatic gun; the difficulty of distinguishing an automatic gun from a semiautomatic gun; and the inconsistency that would otherwise be created with the Supreme Court's decision in *Staples,* which required proof that the

37

defendant knew the gun was automatic in order to convict him of possessing an unregistered automatic weapon.

First, the severe penalties at issue here support requiring proof of the defendant's mens rea. The Supreme Court has repeatedly stated that "the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea*." *Staples v. United States,* 511 U.S. 600, 616, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). In *X-Citement Video,* the Court said that the "concern with harsh penalties looms equally large respecting § 2252." *United States v. X-Citement Video, Inc.,* 513 U.S. 64, 72, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). In *U.S. Gypsum,* the Court said: "The severity of these sanctions provides further support for our conclusion that the Sherman Act should not be construed as creating strict-liability crimes." *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 442 n. 18, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). And in *Morissette,* the Court found larceny not to be a strict liability crime in part because "the penalty is high and, when a sufficient amount is involved, the infamy is that of a felony, which, says Maitland, is 'as bad a word as you can give to man or thing.'" *Morissette v. United States,* 342 U.S. 246, 260, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (ellipsis omitted).

. . .

In this case, the additional imprisonment that turns on the automatic character of the gun is an extra *20 years;* the extra 20 years is a *mandatory minimum;* and the resulting 30-year mandatory minimum sentence for this Section 924(c) offense must be served *consecutively* to (that is, in addition to) the sentence for the underlying robbery. The penalty at issue here is thus dramatically more severe than the penalties in those earlier Supreme Court mens rea cases. In the words of the Supreme Court, the extra 20 years of mandatory, consecutive prison time here is an "extreme sentencing increase." *United States v. O'Brien,* -- U.S. --, 130 S.Ct. 2169, 2178, 176 L.Ed.2d 979 (2010).

Congress could have decided that carrying either a semi-automatic or an automatic gun during a robbery is equally depraved and equally worthy of a 30-year mandatory sentence. Congress did not do so. It believed that carrying an automatic gun is far more serious and depraved, warranting an extra 20 years of mandatory prison time above that for carrying a semi-automatic gun. Almost a fortiori from the Supreme Court's decisions in *Staples, X-Citement Video, U.S. Gypsum,* and *Morissette,* the additional 20 years of mandatory prison time

strongly supports requiring proof of mens rea – namely, proof that the defendant knew the automatic character of the gun.

*Second,* the difficulty of distinguishing an automatic gun from a semi-automatic gun supports requiring proof of mens rea. Automatic and semi-automatic guns may appear externally similar if not identical, as the *Staples* Court explained. *See* 511 U.S. at 615, 114 S.Ct. 1793. And "virtually any semiautomatic weapon may be converted, either by internal modification or, in some cases, simply by wear and tear," into an automatic weapon. *Id.* The Supreme Court thus recognized that it is quite possible for someone who possesses an automatic weapon to "genuinely and reasonably" believe that he possesses "a conventional semi-automatic" weapon. *Id.* (citation omitted).

*Third,* requiring proof of mens rea is supported by the Supreme Court's decision in *Staples,* which applied the presumption of mens rea in very similar circumstances. There, the Court considered a statute that criminalized possession of an unregistered automatic gun. The statute contained no express mens rea requirement. The Supreme Court applied the presumption of mens rea and required the Government to prove that the defendant knew that the gun was automatic.

The decision in *Staples* raises a straightforward question: If the presumption of mens rea applied in *Staples* to the gun's automatic character, why shouldn't it also apply *here* to the gun's automatic character? The majority opinion offers no persuasive answer to that question.

. . .

It is of course true, as the majority opinion notes, that "Section 924(c)(1)(B)(ii) is silent regarding a *mens rea* requirement." Maj. Op. at 511. But as the Supreme Court has explained again and again, "mere omission from the statute of any mention of intent will not be construed as eliminating that element from the crimes denounced." *United States v. Bailey,* 444 U.S. 394, 406 n. 6, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) (quoting *Morissette,* 342 U.S. at 263, 72 S.Ct. 240) (brackets omitted). To state the obvious: If the presumption of mens rea were overcome by statutory silence, it would not be much of a presumption. But the presumption of mens rea is quite potent. Indeed, the Supreme Court has stated that statutes containing no express mens rea requirement still *unambiguously* contain a mens rea requirement. You read that correctly. *See Staples,* 511 U.S. at 619 n. 17, 114 S.Ct. 1793.

*Burwell*, 690 F.3d at 547-549 (emphasis in original). As Judge Kavanaugh noted in

concluding his dissent:

> It's tempting to conclude that Burwell got what he deserved – that carrying a semi-automatic gun during a robbery (as Burwell allegedly believed he was doing) is just as depraved and blameworthy as carrying an automatic gun during a robbery. But neither Congress nor the Supreme Court agrees. Congress deliberately selected 10 years as the mandatory minimum sentence for a person who commits a robbery while carrying a *semi-automatic* gun. And Congress deliberately chose 30 years as the mandatory minimum sentence for a person who commits a robbery while carrying an *automatic* gun. As the Supreme Court explained in *O'Brien*, Congress drew that dramatic distinction because it believed that carrying an automatic gun during the robbery reflected significantly greater moral depravity by the defendant. But that link between the automatic weapon and greater moral depravity does not hold if the defendant actually thought his gun was a semi-automatic.

*Id.* at 553 (emphasis in original).

Judge Rogers, agreeing with "many of the reasons stated by Judge Kavanaugh",

filed a separate dissent. *Burwell*, 690 F.3d at 519 (Rogers, J., dissenting). Judge Rogers

first opined that the majority erred in following its prior decision in *United States v. Harris*,

decided in 1992, in light of intervening Supreme Court precedent:

> The majority concludes, in applying the doctrine of *stare decisis,* that "Burwell and his amici have failed to establish that *any* intervening legal development has weakened, much less removed, the conceptual underpinnings of *Harris.*" *Ante* at 510 (Brown, J., majority op.) (emphasis added). But the Supreme Court has twice stated that carrying a machinegun involves heightened culpability. *See United States v. O'Brien,* -- U.S. --, 130 S.Ct. 2169, 2178, 176 L.Ed.2d 979 (2010) (stating that "choosing" a machinegun involves "moral depravity"); *Castillo v. United States,* 530 U.S. 120, 126, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000) ("[T]he difference between carrying, say, a pistol and carrying a machinegun ... is great, both in degree and kind."). Undeniably, our holding in *United States v. Harris,* 959 F.2d 246, 259 (D.C.Cir. 1992), that conviction under 18 U.S.C. § 924(c)(1)(B)(ii) did not require proof of *mens rea,* was

premised on the opposite view: "[T]here does not seem to be a significant difference in *mens rea* between a defendant who commits a drug crime using a pistol and one who commits the same crime using a machine gun; the act is different, but the mental state is equally blameworthy," *id. Dicta* or not, *see ante* at 509 (Brown, J., majority op.), the Supreme Court has twice rejected a key basis underlying *Harris's* conclusion that there is no *mens rea* requirement in § 924(c)(1)(B)(ii). *See Patterson v. McLean Credit Union,* 491 U.S. 164, 173, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *see also Montejo v. Louisiana,* 556 U.S. 778, 792-93, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009); D.C. CIR. R. 35(a)(2).

*Id.* Judge Rogers continued:

Section 924(c)(1)(B)(ii) does not risk criminalizing otherwise innocent conduct in this sense, but the mandated thirty-year minimum, consecutive term of imprisonment means the public welfare exception is inapposite. In the absence of controlling precedent, and given that *Harris's scienter* premise has been rejected, I would hold, . . . that the severe additional punishment mandated by section 924(c)(1)(B)(ii) (magnitudes greater than any of the other statutes considered in the relevant Supreme Court precedent) requires for conviction proof of the defendant's knowledge that the firearm was a machinegun.

*Id.* at 519-520.

Judge Rogers identified three "interpretative rules", derived from Supreme Court precedent, that were also addressed by the *Burwell* majority: (1) that "courts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element"; (2) "where the statute is silent as to *mens rea,* so the first rule provides no source of a *mens rea* requirement, the Supreme Court has applied a presumption of *mens rea* to avoid criminalizing otherwise innocent conduct"; and (3) "an exception to the background principle disfavoring strict liability crimes for 'public welfare' or 'regulatory' offenses." *Burwell,* 690 F.3d at 520-521. Although Judge Rodgers recognized that "[t]o date, the three interpretative rules have worked in tandem in

41

Supreme Court precedent to counsel for or against requiring proof of *mens rea*", *id*. at 521,

she reasoned that:

> In the case before the court today, the interpretative rules, in their present form, cannot provide the answer to whether the machinegun provision requires proof of *mens rea*. Section 924(c)(1)(B)(ii) has no explicit *mens rea* to "travel" through the subsection, and it does not risk criminalizing "entirely innocent" conduct. Thus neither of these two rules counsel in favor of requiring proof of *mens rea*. But nor do they necessarily require imposition of strict liability either. The narrow exception to the rule favoring proof of *mens rea,* the public welfare offense exception, does not apply – the Supreme Court has concluded that firearm statutes do not fit within the type of crimes contemplated by the public welfare exception, *see Staples,* 511 U.S. at 611-12, 114 S.Ct. 1793, and has suggested that the exception has been generally limited to statutes with minor penalties, *id*. at 616, 618-19, 114 S.Ct. 1793. Section 924(c)(1)(B)(ii) would represent an entirely new category of strict liability for offense elements – one that imposes a sentence magnitudes larger than any of the statutes in the relevant cases the Court has previously considered.

*Id.* at 524-525.

Breaking with Judge Kavanaugh's suggestion that "'the presumption of mens rea

means that, unless Congress plainly indicates otherwise, the Government must prove the

defendant's mens rea for each element of the offense,' . . . regardless of whether that

'element' is anywhere near an explicit *mens rea,* or whether the statute risks criminalizing

otherwise innocent conduct", Judge Rogers, relying on *Staples,* opined that "this case can

be resolved on a narrower ground":

> The Supreme Court in *Staples* stated that "[h]istorically, the penalty imposed under a statute has been a *significant* consideration in determining whether the statute should be construed as dispensing with *mens rea.*" 511 U.S. at 616, 114 S.Ct. 1793 (emphasis added). Although this statement was made in the context of holding that the public welfare exception was inapplicable, there is no obvious reason to limit the relevance of this consideration to determining

whether that exception applies to impose strict liability. If an offense must have a minor punishment to be a public welfare offense, and in so limiting that category the Court was concerned with protecting the background principle disfavoring non-*mens rea* crimes, then the presence of a "severe penalty," *id.* at 618, 114 S.Ct. 1793, should not, without an express statement by Congress, portend a new category of strict liability crimes.

*Id.* at 525.

Judge Rogers thus explained:

Without deciding how the interpretative rules might unfold in a case with a different statutory punishment, I would take my lead from *Staples* and hold that the mandated thirty-year consecutive term of imprisonment imposed by section 924(c)(1)(B)(ii) is so severe that it outweighs the fact that the conduct prohibited is not otherwise totally innocent. In *O'Brien*, the Supreme Court defined the section 924(c)(1)(B)(ii) offense in terms of the automatic firing characteristic of the firearm, *see* 130 S.Ct. at 2172, given "[t]he immense danger" and "moral depravity in choosing the weapon," *id.* at 2178. Congress has determined that possessing a machinegun "during and in relation to any crime of violence or drug trafficking crime," 18 U.S.C. § 924(c)(1)(A), warrants twenty years' additional imprisonment over such possession of a semi-automatic assault weapon, *compare id.* § 924(c)(1)(B)(i), *with id.* § 924(c)(1)(B)(ii). A leading commenter has observed that the hostility to strict liability for crimes protects a defendant "unaware of the *magnitude* of the wrong he is doing," Wayne R. LaFave, Criminal Law 304 (5th ed.2010) (emphasis added); *see post* at 543 (Kavanaugh, J., dissenting); *ante* at 516-17 (Sentelle, C.J., concurring) ("I do not think it good enough to posit that someone should know conduct is illegal and therefore avoid it where the illegality of the conduct may be measured in degrees."). The Court's observation in *Staples,* 511 U.S. at 614-15, 114 S.Ct. 1793, is directly on point: "The Government does not dispute ... that virtually any semiautomatic weapon may be converted ... into a machinegun.... Such a gun may give no externally visible indication that it is fully automatic. But in the Government's view, any person ... can be subject to imprisonment, despite absolute ignorance of the gun's firing capabilities, if the gun turns out to be automatic." (internal citations omitted). For punishment, then, of an additional twenty-years' imprisonment for possessing an automatic, rather than a semi-automatic, firearm, neither silence, nor mere use of a passive voice or the meaning of surrounding provisions, *see Dean,* 556 U.S. at 572-74, 129 S.Ct. 1849, are sufficient to rebut the traditional *mens rea* requirement for criminal

43

offenses, and the Government must prove a defendant knew the firearm he possessed was a machinegun in order to obtain a conviction under section 924(c)(1)(B)(ii).

*Id.* at 526.

In contrast to the Eleventh Circuit's opinion and the majority's opinion in the D.C. Circuit, in 2023, the First Circuit in *United States v. Pérez-Greaux* held that the Government is required to prove, beyond a reasonable doubt, that the defendant knew the firearm that he possessed had the characteristics of a machinegun. In reaching this conclusion, the Circuit framed the relevant question as follows: "Did Congress intend to make a conviction for the possession of a machinegun under § 924(c)(1)(B)(ii) a strict liability crime?" *Pérez-Greaux*, 83 F.4th at 13. The First Circuit acknowledged the holdings of the Circuit Courts in *Haile* and *Burwell*, but disagreed with their reasoning and holdings.

The First Circuit found "no explicit expression of congressional intent as to mens rea within the plain meaning of" § 924(c) and determined that the legislative history and statutory structure to determine congressional intent provided no guidance. *Pérez-Greaux*, 83 F.4th at 14-15. The Circuit Court thus turned to "the Supreme Court's treatment of mens rea", acknowledging that "the Supreme Court's jurisprudence on the precise issue that we confront is unsettled" but stating that the Circuit Court's decision "is in line with the [Supreme] Court's case law, as well as with the recognized principles of proportionality (given the thirty-year mandatory minimum imposed by the statute), which animates the Supreme Court's mens rea analysis." *Id.* at 15.

44

Following a review of applicable Supreme Court precedent, the *Pérez-Greaux* Court reasoned that the Supreme Court's decision in *O'Brien* "eliminated the underlying assumption that other circuits had previously relied on to justify excluding a mens rea requirement from possession of a machinegun: that subsection (c)(1)(B)(ii) was a sentencing factor that did not require evidence of mens rea." *Id.* at 16. The Circuit recognized that "*O'Brien* left open whether the government needed to prove that the defendant knew that the firearm in question included the characteristics relevant to the section charged", but nonetheless reasoned that "because mens rea presumptively applies to elements of a crime and because the Supreme Court determined that the automatic character of a firearm is an element of the offense, rather than a sentencing factor, it only follows that § 924(c)(1)(B)(ii) is subject to the mens rea presumption." *Id.* at 17.

Presumably relying on the reasoning set forth by the D.C. Circuit in *Burwell*, the Government in *Pérez-Greaux* asserted that the presumption of mens rea was "inapplicable to § 924(c)(1)(B)(ii) because this statute includes the predicate crime of either drug trafficking or a crime of violence and 'does not punish conduct that would otherwise be innocent.'" *Pérez-Greaux*, 83 F.4th at 17. The First Circuit disagreed with this assertion for a number of reasons, including: (1) that "[t]he Supreme Court has indeed applied the presumption to cases where a statute criminalizes otherwise innocent conduct" and "[t]he Court has also often emphasized scienter's importance in separating wrongful from innocent acts"; (2) "it does not necessarily follow that the presumption [of mens rea] only applies [if

45

there is no predicate crime] and nowhere else"; and (3) "the Supreme Court has not explicitly articulated a rule dictating that the presumption will only apply where innocent conduct is at stake. Instead, the Court has repeatedly stated that criminal offenses that dispense with a mens rea requirement are 'disfavored.'" *Id.* at 17-18 (underlines in original). Further, "[d]oing away with the defendant's knowledge of the characteristics of the firearm would make possessing a machinegun a strict liability crime, which would eliminate the longstanding 'concurrence of an evil-meaning mind with an evil-doing hand.'" *Id.* at 18 (quoting *Morissette*, 342 U.S. at 251).

The First Circuit, having determined that the *mens rea* presumption applied to the machinegun element of § 924(c), took the further action of "ask[ing] whether there is some specific indication from Congress that it should not apply to § 924(c)(1)(B)(ii)." *Pérez-Greaux*, 83 F.4th at 18. The Court found "no indication here that Congress sought to take the extraordinary step of making § 924(c)(1)(B)(ii) a strict liability offense." *Id.*

Underlying the First Circuit's detailed legal reasoning was the Court's clear reticence, based on principles of fairness and equity, and supported by Supreme Court precedent, to require the imposition of a mandatory minimum sentence of 30-years in the absence of proof beyond a reasonable doubt that the defendant knew the firearm at issue was a machinegun. *See e.g.*, *Pérez-Greaux*, 83 F.4th at 20 ("Because a minimum of thirty years hang in the balance for defendants charged with § 924(c)(1)(B)(ii), it does not make sense that Congress would impose such a draconian sentence for a crime and not hold the

46

government to the burden of proving knowledge of the specific characteristics of the firearm that make the defendant culpable under that particular section. Common sense and the above-referenced cases indicate that Congress could not have intended a strict liability crime for a crime with a thirty-year sentence attached."); *id.* ("But where thirty years are at stake, holding the government to its burden of establishing the defendant's knowledge beyond a reasonable doubt is paramount to maintaining our understanding of the choice between good and evil. Holding otherwise would mean that a defendant can be subject to an additional thirty years' imprisonment, despite absolute ignorance of the gun's firing capabilities, if the gun used in a crime of violence or drug trafficking offense turns out to be an automatic. And we know that ignorance is indeed possible since virtually any semiautomatic weapon may be converted, either by internal modification or, in some cases, simply by wear and tear, into a machinegun.") (internal quotation marks, citations, and brackets omitted). *See also, id.* at 15 ("While the Supreme Court's jurisprudence on the precise issue that we confront is unsettled, our decision . . . is in line with the Court's case law, as well as with the recognized principles of proportionality (given the thirty-year mandatory minimum imposed by the statute), which animates the Supreme Court's mens rea analysis."); *id.* at 18 ("Merely because a defendant has already engaged in wrongdoing does not mean that the government should not be held to the burden of demonstrating that the defendant consciously chose between two distinct types of firearms. Why should this underlying offense trigger an additional thirty years when Congress punished that conduct

47

elsewhere? In other words, while a § 924(c)(1)(B)(ii) defendant might be guilty of the predicate offense -- that is, possession of a firearm in furtherance of a crime of violence or drug trafficking crime -- we see no logic in dispensing with the requirement of a vicious will for the second offense where the only additional element is that the firearm is a machinegun. This is particularly true where the type of firearm chosen can potentially result in a sixfold sentencing increase.").

Here, this Court finds unpersuasive the reasonings set forth by the Eleventh Circuit and the D.C. Circuit in its majority opinion. In addition, as correctly noted by the First Circuit, both the Eleventh Circuit and D.C. Circuit's decisions "were based, in large part, on [that] circuit's precedent", *see Pérez-Greaux*, 83 F.4th at 21, all of which was established prior to *O'Brien*. This Court is not bound by such precedent and, where the Third Circuit has not decided the issue of whether there is a *mens rea* requirement as to § 924(c)(1)(B)(ii) or even suggested in *dicta* any agreement with the Eleventh Circuit or D.C. Circuit's opinions in *Haile* or *Burwell*, this Court is not required to afford deference to the decisions of those Circuit Courts. Rather, this Court finds Judges Kavanaugh and Rogers' analyses and applications of the relevant Supreme Court case law, as well as that set forth by the First Circuit, to be the stronger and better reasoned applications of Supreme Court precedent in light of its decision in *O'Brien*.

At trial, this Court followed the Third Circuit Model Jury Instructions and Third Circuit case law in setting forth the jury instructions and verdict form. Those proposed Third Circuit

48

instructions, and their accompanying Commentary, do not address or reference the presence, or lack thereof, of a *mens rea* requirement as to a machinegun, nor has the Third Circuit directly addressed this issue in any precedential opinion. Notwithstanding the lack of legal authority in this Circuit, upon review of the Supreme Court's opinion in *O'Brien* and the law as it has developed in other Circuits since *O'Brien*, and in particular the dissenting opinions of Judge Kavanaugh and Judge Rodgers in *Burwell*, which are largely paralleled by the First Circuit's reasoning in *Pérez-Greaux*, this Court has independently determined that § 924(c)(1)(B)(ii) contains an implicit *mens rea* requirement necessitating that the Government prove beyond a reasonable doubt that the defendant knew the firearm that was possessed in relation to the crime of violence had the characteristics of a machinegun.

Where the jury in this case was not properly instructed as to the need to determine whether Defendant Rodriguez had knowledge of the characteristics of the firearm, specifically, whether it was a machinegun, this Court must address whether this error was harmless. *See Neder v. United States*, 527 U.S. 1, 15 (1999) (holding that omission of an element in a jury instruction is subject to harmless-error analysis). "The harmless-error standard is the converse of the insufficient evidence standard." *United States v. Zayas*, 32 F.4th 211, 225 (3d Cir. 2022). "A district court's failure to instruct the jury on an element of the offense will be harmless error if, based on the evidence, no reasonable jury could find that the element was not present. However, if the record contains 'evidence that could rationally lead to a contrary finding with respect to the omitted element,' the error is not

49

harmless." *United States v. Andrews*, 681 F.3d 509, 527 (3d Cir. 2012) (citing *Neder*, 527 U.S. at 18-19). *See also*, *Neder*, 527 U.S. at 19 ("safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error – for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding – it should not find the error harmless.").

Here, this Court cannot say that no reasonable jury could find that Rodriguez did not know that one of the firearms used during the August 30, 2020, robbery and September 14, 2020, robbery was a machinegun. The error was therefore not harmless. The Government, through its expert witness, ATF Firearms Officer Anthony Ciravolo, undoubtedly presented sufficient evidence to establish beyond a reasonable doubt that one of the firearms used at both robberies was a machinegun. However, the Government offered limited and circumstantial evidence as to Rodriguez's knowledge of the characteristics of the firearm which rendered it a machinegun and Defendant, through cross-examination of several witnesses, elicited sufficient testimony that could support a successful defense by Rodriguez at trial that he was unaware of the firearm's characteristics.[9]

---

[9] Due to the varying word choices of witnesses at trial in describing the machinegun, throughout this memorandum opinion, the machinegun at issue is referred to as an "AR-15", "ARP", and "rifle".

Preliminarily, Officer Ciravolo, who was admitted as an expert in Firearm Identification Operation, testified as to his examination of the machinegun at issue in this case, identified by Officer Ciravolo as "an AR-type weapon that was chambered in the 300 Blackout." (Trial Tr., Test. of Ciravolo, June 14, 2024, at 192-193).  Officer Ciravolo testified as follows with respect to his findings related to the gun he examined:

- "[T]he first thing that I noticed was there were no markings on the firearm, and, then, the second thing I noticed was that the automatic sear pin was present."

- The automatic sear pin on the firearm "is a pinhole above the safety selector on the receiver that is right above the grip, and that pin, in and of itself, is a determining factor about whether or not this is a machine gun receiver, so it tells me that I'm looking at what is a machine gun."

- "The only purpose for [the automatic sear] pin to be there is to house the automatic sear, and the presence of the holes, alone, of that pin tell you that this is the receiver of the machine gun."

- "On the left side [of the machinegun], we're looking at the left side of the receiver, at the safety selector, and we can see the markings that are on the safe and fire position, which appear to be hand-marked, and, then, directly above that, what we're looking at is the automatic sear pin, and you can see there's a vertical and horizontal white line there indicating where the hole should be marked to be drilled."

51

- The firearm had three modes of fire: "[t]here are two modes of fire that are marked as S, for safe, and F, for fire, but there are, actually, three modes of fire for this. The firearm is equipped with all of the appropriate M16-type three-round burst components, and that will allow the weapon to be placed into the safe, semi-automatic, and then the automatic position."

- Following a "manual function test" wherein Officer Ciravolo "separated the upper assembly from the receiver to examine the fire control components of it to see what firearm parts it was assembled with", he determined two "notable things": "one, that the interior of the cavity is what's known as, in the light, you see -- in the white, you see the raw silver aluminum that is free of any coating, that tells you that that was drilled out after this item was produced. And the other thing is the automatic sear, which I'm circling now (indicating), and, then, on the lower picture, where the hammer is in the forward position, we see the two disconnectors of the three-round burst components."

- Officer Ciravolo performed a functionality test which included manually cycling the firearm and noted that "[d]uring my manual cycling of the firearm, I noted that the burst cam did not seem to be working, at all, and the firearm, in the automatic position, was only functioning as a full automatic."

- Having determined that the firearm was safe to fire, Officer Ciravolo tested it. He explained:

> With our test fires, we will start off with just shooting one round, so we will place one round in it, put it on fire, on semi-automatic, and pull the trigger. I'll, then, examine that brass case to see if there's any signs of head space issues or any reason that the brass would be, visually, telling me that the weapon is unsafe to shoot.
>
> From there, I place two rounds in the weapon and shoot it in the semi-automatic setting, and when I did that, the weapon fired upon the release of the trigger, which is uncommon for something like this. I did that test, again, and I achieved the same result.
>
> Because it was firing on the release of the trigger, I then placed three rounds in the firearm on the semi-automatic position, and when I did that, it fired one round on the pull of the trigger, and upon the release of the trigger, it fired two rounds, automatically.
>
> After that, I placed the weapon in the automatic position and I loaded two rounds in. The firearm fired two rounds, automatically, by a single function of the trigger, and I then moved on to five rounds, and the weapon shot all five rounds, automatically, by a single function of the trigger, and I did that one additional time.

(*Id*. at 195-203).

Although Officer Ciravolo provided ample testimony that the firearm that he examined was a machinegun, he also testified that the firearm was privately made (a "ghost gun") and admitted that he did not know when the firearm was made to be fully automatic. (*Id*. at 203-204). On cross-examination, Officer Ciravolo explained:

> Q. Let's put it this way. [The firearm] has the capability, depending on how it's modified or what's done to it, to be, either, a semi-automatic or an automatic machine gun; correct?
>
> A. Correct.

Q. What you indicated was, you showed scratches and things inside that gun showing where holes would be drilled, which is how you would make it automatic; correct?

A. Yes.

Q. So this gun may have started off as a complete semi-automatic firearm; correct?

A. That's possible.

Q. And if and when, in fact, it was modified into a machine gun, you have no idea?

A. That is correct.

Q. And, in fact, it could have been the day before the Government seized it in this case; correct?

A. Yes.

Q. You'd agree with me that, you know, looking at it, to the naked eye, without looking at what you did close up on the gun, it's consistent with a semi-automatic weapon?

A. I believe that would be based on your level of knowledge. From here, I can see the automatic sear pin, and that would immediately tell me that it's a machine gun.

. . . .

Q. To a layperson, it's not readily differentiable between a semi-automatic and automatic; correct?

A. I believe that it depends. So it would depend on your level of knowledge of firearms. So there's a mystical thing that everyone refers to as the third pin of the AR, and that third pin is always in reference to the automatic sear pin. Anyone who has really any of experience with AR-type firearms or who has been involved in shooting or any of the firearms community stuff would know that the third pin is in reference to that and would know the location of it. So it's really impossible for me to say what another person would or would not know,

54

based on the outward appearance of it, because the automatic sear spin is such an indicative thing of a machine gun.

(*Id.* at 205-207). With respect to whether a lay person could determine that the firearm was a machinegun based solely on its appearance, Officer Ciravolo further testified on cross-examination:

Q. As you said, when I asked you about what a layperson would see or know, this small hole, right there (indicating), that pin, that is, from the outside, is what differentiates it as from a machine gun and a semi-automatic; correct?

A. Yes, if we're talking about manufactured AR or M16 or M4 types, there's, also, conversion devices that would be internal that you would not be able to tell. But for outward appearances, yes, that would be the way to tell, correct.
. . . .

Q. This one small point that my finger is pointing to is the only thing, if you did fire it, that would tell you it's a machine gun and not a lawful semi-automatic weapon?

A. Externally, yes.

(Trial Tr., Test. of Ciravolo, June 14, 2024, at 207). Officer Ciravolo's testimony thus undisputedly established that the firearm at issue was a machinegun but created issues as to when the firearm became a machinegun and whether Rodriguez had the necessary level of firearm knowledge to identify the firearm as a machinegun.

At trial, Alarick Batista, a co-conspirator of Wong and Rodriguez, also testified on behalf of the Government. In relevant part, Batista testified as to his membership in the Infamous Ryders Motorcycle Club, his involvement in both the attempted robbery on August

55

29, 2020, and the robbery on August 30, 2020, and his relationship with Rodriguez, Wong, and other individuals connected to the robberies.

In mid-2020, Batista moved into a house with Joushton Rodriguez on Sillyman Street, in Cressona, which was owned by Wong and which was also located next to Wong's home. (Trial Tr., Test. of Batista, June 12, 2024, at 167-169). Batista testified that during the relevant time period he had seen Rodriguez with guns. (*Id.* at 172). He further testified that he had seen Joushton Rodriguez with several guns, including an ARP "rifle". (*Id.*).

With respect to the ARP, Batista stated that prior to moving into the Sillyman Street house, he was visiting Joushton Rodriguez and saw "Uncle Charlie" and another man selling the firearm to Joushton Rodriguez. (*Id.* at 172-173). On direct examination, Batista testified:

> Q. Who was counting money and making a transaction happen? You named Uncle Charlie, and who else did you know?
>
> A. The other man that I don't know of was helping Uncle Charlie count the money.
>
> Q. Who else was there then?
>
> A. It was Joushton Rodriguez.
>
> Q. Was he doing the transaction?
>
> A. Yes.
>
> Q. While you were there, did you notice anything about that firearm?
>
> A. He opened the top half of the rifle and he showed an engravement, kind of like if it was drilled out.

56

Q. And did you talk to Joushton Rodriguez about the gun?

A. I didn't talk to him about it, but he talked to me about it.

Q. And what did he say to you about it?

A. He was like, we got this gun now and –

. . . .

A. So they explained on the mechanism of the weapon and how it works. He loaded it and unloaded it and showed how to work it.

Q. And did Joushton explain any particular difference in this gun than a regular gun?

A. It was stated that it was a fully automatic rifle.

(Trial Tr., Test. of Batista, June 12, 2024, at 173-174).  Batista confirmed that this firearm was purchased prior to the August robberies.  (*Id*. at 174-175).

On cross-examination, Wong's counsel further questioned Batista about the circumstances surrounding Joushton Rodriguez's purchase of the ARP:

Q. . . . So here's one thing I want to understand. We have heard a lot about the AR-15, but that was the gun that you held up there in front of the jurors. Do you recall that?

A. Yes.

Q. But the AR-15, we can agree, I think even by your testimony, is used in the robberies on August 29th and August 30th, correct?

A. Yes.

Q. And the AR-15 is the weapon, according to you, that is purchased on the street, correct?

57

A. I was there when it was purchased.

. . . .

Q. Can you give me a time of year this AR-15 was purchased?

A. It was literally several weeks before that robbery, but I can't remember quite so good.

(*Id.* at 206-210).

With respect to the August 29, 2020, attempted robbery in Schuylkill Haven, Batista testified as follows:[10]

Steven Wong said I'm driving. He told Joushton Rodriguez to go in with the rifle. He told Cornelius -- excuse me -- Solomon Rodriguez to go in with the gun. I forgot who went in with the knife and a gun, but they had a knife and a gun on them. We were directed to drive to this address in Schuylkill Haven by Steven Wong.

(*Id.* at 179).  Batista stated that he drove himself and others to the address provided to him and parked in an alleyway.  When asked what firearms the other individuals in the car had, Batista responded:

Q. And do you remember which gun Joushton Rodriguez had?

A. He had the Hellcat.

Q. And do you remember what other guns were there?

A. The ARP.

---

[10] Counts 4 and 5, charging violations of § 924(c), relate to the robberies of August 30, 2020, and September 14, 2020.  However, the events leading up to these robberies, as well as the events of the attempted robbery on August 29, 2020, are relevant to a determination of whether Rodriguez knew that one of the firearms used on August 30 and September 14 was a machinegun.

Q. And is that the ARP that was purchased that you talked about that was a machine gun?

A. Yes.

Q. And you're not sure who had that? It's okay if you can't remember.

A. I seen Joushton Rodriguez go out the vehicle with the rifle -- well, excuse me. Cornelius Green had the rifle and Joushton Rodriguez had the handgun on him.

(*Id.* at 180-181). (*See also*, Trial Tr., Test. of Batista, June 13, 2024, at 14 (stating that Solomon Rodriguez possessed the Hellcat firearm and that he did not remember who had the ARP)).

With respect to the August 30, 2020, robbery of Joseph Lumia in Mahanoy City, Batista testified that, on that day, he was at either Wong's house or his own house next door, with Rodriguez, Wong, and Joshua Marsh, and that Marsh provided Wong with an address to rob. (Trial Tr., Test. of Batista, June 12, 2024, at 186-187). Wong instructed Batista that he and Eric LaSalle would be the drivers for the robbery.

Q. So then who all left to go to do this robbery that you can remember?

A. Like I said, it was me driving, Solomon Rodriguez in the passenger's seat, Joushton Rodriguez in the back, Joshua Marsh in back, and Eric LaSalle was driving the Jeep Wrangler.

Q. Before you left Sillyman Street, did you see any firearms?

A. Yes.

Q. What did you see that you can remember?

A. I seen an ARP.

Q. Is that the ARP that I showed you as a Government's exhibit?

A. Correct. I seen a black Hellcat that was registered under Odie, I seen the -- it was the Glock, the black Glock, and then there was a silver handgun that was utilized as well, and also a knife.

Q. And did they have those firearms and weapons when they got into the van and into the Jeep?

A. Yes.

(*Id.* at 188-189). Batista testified that Rodriguez had a knife during this robbery and that Joushton Rodriguez had the ARP. (*Id.* at 192-193).

Eric LaSalle, who, like Batista, pleaded guilty in related criminal case 3:21-cr-271, also testified at Wong and Rodriguez's trial.

LaSalle testified that during the summer of 2020, he had seen several members of the Infamous Ryders Motorcycle Club, including Rodriguez, Wong, Joushton Rodriguez, Cornelius Green, and Alarick Batista, with firearms. (Trial Tr., Test. of LaSalle, June 13, 2024, at 153). With respect to the ARP, LaSalle testified that he had seen that firearm "around the guys", had seen Batista and Joushton Rodriguez in possession of the firearm, and that he had personally handled the weapon. Batista and Joushton Rodriguez told him that it shot "a burst." (*Id.* at 154).

LaSalle testified as to his role in the August 30, 2020, robbery in Mahanoy City. LaSalle explained that he was at Wong's house that day and Wong informed him that he

would be a "decoy" driver while other individuals went into the home to commit the robbery for money and drugs. (Trial Tr., Test. of LaSalle, June 13, 2024, at 157-158).

A. [Wong] said that I was just going to be a driver and it would be quick and then I could go home afterwards.

Q. What car were you assigned to drive?

A. I was driving Alarick's Jeep Wrangler.

Q. Were there any other cars that were involved?

A. Yes. There was a minivan, Solomon Rodriguez's minivan that Alarick Batista was driving with Joushton Rodriguez, Solomon, Alarick, and Marsh.

Q. Before you left, did you see any firearms at Steven Wong's house that night?

A. Yes.

Q. What type of firearms?

A. AR pistol, the Glock 40, the Hellcat 9.

Q. This AR pistol, the one that you just held up, Government's 4.3?

A. Yes.

Q. Who had that?

A. Joushton Rodriguez.

Q. Who had the other firearms?

A. Solomon Rodriguez. I don't know what he had, what kind of gun it was, but I'm sure it was either the Glock or the .9 millimeter.

(*Id.* at 158-159).

Joshua Marsh, a third co-conspirator who pleaded guilty in related criminal case 3:21-cr-271, also testified at trial. When addressing the August 30, 2020 robbery, Marsh stated that he saw Rodriguez with a knife during the robbery, but not a firearm, and that Joushton Rodriguez had the AR-15. (Trial Tr., Test. of Marsh, June 13, 2024, at 68).

At trial, Solomon Rodriguez testified in his own defense. Rodriguez stated that he "didn't purchase not a single firearm", never had them in his possession, and never used them. (Trial Tr., Test. of S. Rodriguez, June 18, 2024, at 223). However, he admitted that he knew about firearms being used to protect Wong's club, Dubai. (*Id.*). Although Rodriguez admitted to having seen Wong in possession of a firearm in his home, he testified that he was "not familiar with firearms" and therefore could not say what firearms were at Wong's home. (*Id.* at 228). He also stated that he had previously seen Cornelius Green with a handgun. (*Id.* at 225).

With respect to the machinegun, Solomon Rodriguez identified the firearm held by Cornelius Green in the video of the September 14, 2020, robbery as an AR-15 and testified that he had previously seen Joushton Rodriguez with this AR-15 "in the house in Sillyman." (Trial Tr., Test. of S. Rodriguez, June 18, 2024, at 227). After identifying the AR-15 possessed by Joushton Rodriguez during the robbery on August 30, 2020, from surveillance video of the incident, Rodriguez admitted that this was the same firearm that he had seen in one of Wong's town homes prior to that date. (*Id.* at 231; *see also*, *id.* at 241). Rodriguez

62

testified that he had seen Joushton Rodriguez, Batista, and LaSalle in possession of the AR-15. (*Id.* at 245).

Based on the testimony and evidence presented at Rodriguez's trial with respect to his knowledge of the characteristics of the machinegun, the court cannot conclude beyond a reasonable doubt that the jury verdict with respect to the § 924(c)(1)(B)(ii) charge would have been the same if the jury had been instructed as to the *mens rea* requirement.

Here, Officer Ciravolo testified that the firearm he was asked to examine was a machinegun and explained to the jury the basis of his findings and the specific characteristics of the firearm which rendered it a machinegun. However, he also admitted that a small hole on the firearm was, from the outside, the only thing that differentiated the firearm as a machinegun from a semi-automatic gun and that it was "impossible . . . to say what another person would or would not know [as to whether the firearm was a machinegun], based on the outward appearance of" the machinegun at issue because it would "depend on [the individual's] level of knowledge of firearms" (Trial Tr., Test. of Ciravolo, June 14, 2024, at 206-207). At trial, Rodriguez admitted to having seen other individuals, including Wong, in possession of firearms, but he denied that he had any familiarity with firearms or that he had ever used or purchased a firearm. Conversely, Batista and LaSalle both testified that they had seen Rodriguez in possession of a firearm during one or both of the robberies on August 29 and August 30, 2020, although neither witness stated that they had ever seen Rodriguez in possession of the machinegun. This

63

testimony, without more, does not provide a sufficient basis to find, beyond of reasonable doubt, that Rodriguez had the requisite level of knowledge of firearms that he would recognize, based solely on the firearm's outward appearance, that the firearm was a machinegun.

Here, the bare and limited evidence presented with respect to Rodriguez's knowledge as to the characteristics of the machinegun could have rationally resulted in a finding by the jury that the Government had not produced sufficient evidence to establish the necessary *mens rea* element. Batista testified that Joushton Rodriguez had purchased the firearm and was the person who informed him that it was an automatic firearm. Batista further testified that during the robberies in which he was involved, he had seen Joushton Rodriguez and Cornelius Green in possession of the ARP. LaSalle testified that he had seen Batista and Joushton Rodriguez in possession of the ARP and that it was Joushton Rodriguez who had told him that it shot "a burst." Although testimony and evidence were presented demonstrating that Rodriguez had been in the same room as the machinegun while at Wong's residence, and had participated in robberies wherein that gun was used, there was no testimony or evidence that Rodriguez ever physically possessed or examined the machinegun at any time. The Government further adduced no evidence that any person had told Rodriguez that the firearm at issue was a machinegun, that they heard Rodriguez refer to the weapon as a machinegun or automatic firearm, or that Rodriguez ever fired the

weapon, or had seen or heard the weapon be fired, such that he would be aware of its capabilities.

For the afore-stated reasons, the evidence adduced at trial is insufficient for this Court to conclude beyond a reasonable doubt that the jury verdict would have been the same if the jury had been instructed as to the *mens rea* requirement with respect to the § 924(c)(1)(B)(ii) charge. The absence of this instruction was therefore not harmless error and the Court will vacate the convictions as to Jury Interrogatories 4.2 and 5.2.[11]

---

[11] The Government argues that Rodriguez was "found guilty of [Counts 4 and 5] under multiple theories of liability, including accessorial or *Pinkerton* liability, where no such additional knowledge element is required." (Doc. 257, at 61). This argument incorrectly assumes that if the jury could have found Rodriguez guilty under <u>any</u> of the theories of liability presented at trial as to Counts 4 and 5, then the omission of the *mens rea* instruction regarding the machinegun is harmless. Here, the jury was instructed as to the three theories of liability under which it could find the defendant guilty for Counts 4 and 5: (1) personal commission of the offense; (2) *Pinkerton* liability; or (3) aiding and abetting the offense. Because the verdict form did not ask the jury which theory of liability under which it found Rodriguez guilty of those counts, to find that the error in not providing the jury with a *mens rea* instruction as to the machinegun element was harmless, this Court would have to determine that the jury verdict as to Jury Interrogatories 4.2 and 5.2 would have been the same absent the error under <u>each</u> theory of liability.

As the Third Circuit has summarized:

The government may seek a conviction for a substantive criminal offense by introducing evidence that a defendant directly committed the offense or by proceeding on a theory of vicarious liability under *Pinkerton* or aiding and abetting. In *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), "the Supreme Court held that the criminal act of one conspirator in furtherance of the conspiracy is attributable to the other conspirators for the purpose of holding them responsible for the substantive offense." *United States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001) (internal quotation marks, citation, and brackets omitted). A defendant is liable for substantive offenses committed by co-conspirators under a *Pinkerton* theory if (1) the defendant is a party to a criminal conspiracy, (2) one or more co-conspirators committed the substantive offense in furtherance of the conspiracy, and (3) commission of the substantive offense was reasonably foreseeable. *See United States v. Ramos*, 147 F.3d 281, 286 (3d Cir. 1998).

In contrast, to be liable for aiding and abetting under federal law a defendant must "(1) take [ ] an affirmative act in furtherance of that offense, (2) with the intent of facilitating the

Although the Court will vacate the jury's findings as to Jury Interrogatories 4.2 and

5.2 and order a new trial as to those specific elements, this does not require the entirety of

---

offense's commission." *Rosemond* [*v. United States*, 572 U.S. 65, 71, 134 S.Ct. 1240, 1245, 188 L.Ed.2d 248 (2014)]. The Supreme Court in *Rosemond* held that to establish the intent element of aiding and abetting under § 924(c), the government must prove that the aider-and-abettor had advance knowledge that a gun would be employed and decided thereafter to join or continue the underlying offense. *See id.* at 1250.

Both *Pinkerton* and aiding and abetting theories support convictions under § 924(c). *See, e.g., United States v. Casiano*, 113 F.3d 420, 427 (3d Cir. 1997).

*United States v. Whitted*, 734 F.App'x 90, 93 (3d Cir. 2018). Here, the Court cannot say that the jury would have convicted Rodriguez of § 924(c)(1)(B)(ii) under *Pinkerton* if it had been informed of the *mens rea* requirement as to the machinegun. Specifically, there is a question, to be answered by the jury, as to whether Rodriguez's co-conspirator's possession of the machinegun during one or both robberies was "merely a part of the ramifications of the plan which could not be reasonably foreseen [by Rodriguez] as a necessary or natural consequence of the unlawful agreement", *Pinkerton*, 328 U.S. at 648. Even the D.C. Circuit Court's majority opinion in *Burwell*, having found that there was no *mens rea* requirement for § 924(c)(1)(ii), left open the question of whether a defendant could be held liable for a co-conspirator's possession of a machinegun under § 924(c)(1)(ii) if that defendant did not personally possess knowledge of the firearm's characteristics:

Finally, Burwell and the Federal Public Defender argue *Harris* was fundamentally flawed because it imposes unjust penalties on co-conspirators. They note that without a separate knowledge requirement, "mere" co-conspirators in low-level drug conspiracies might be subjected to 30-year sentences for violent or drug-trafficking crimes committed with machineguns in furtherance of the conspiracy, as long as it is reasonably foreseeable that such crimes would involve guns of any kind. This would be unjust, the FPD argues, if the particular defendant "had no reason to foresee, let alone know, that some member of the conspiracy – any member – would use or possess a machinegun (as opposed to a generic firearm)." FPD Br. at 14. But the premise of this argument is not necessarily correct. The Supreme Court has not extended vicarious liability to situations in which "the substantive offense ... could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Pinkerton v. United States,* 328 U.S. 640, 647-48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Because the machinegun provision is an element of the substantive § 924(c) offense, it is not clear (and we express no opinion as to) whether liability would attach to co-conspirators who could not reasonably foresee the use of the machinegun.

*Burwell*, 690 F.3d at 514. Here, this Court cannot say that the jury verdict as to Jury Interrogatories 4.2 and 5.2 would have been the same under *Pinkerton* absent the error. Where it is not apparent what theory of liability formed the basis for the jury's findings in Jury Interrogatories 4.2 and 5.2, the error was therefore not harmless.

the jury's verdict as to Counts 4 and 5 to be vacated. As previously set forth, the verdict form addressing Counts 4 and 5 asked the jury, separately as to Defendants Wong and Rodriguez, whether the jury found beyond a reasonable doubt that the "Defendant possessed a firearm in furtherance of a crime of violence and/or used or carried a firearm during and in relation to a crime of violence . . . all in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)". (Doc. 149, at 5, 8). In response, the jury found Defendant Rodriguez guilty of both Counts 4 and 5. (*Id.*). The verdict form subsequently included two Jury Interrogatories following both Counts 4 and 5. Jury Interrogatories 4.1 and 5.1 asked the jury whether, as to each defendant, "a firearm was brandished in furtherance of a crime of violence and/or a firearm was brandished during and in relation to a crime of violence, as charged in [Counts 3 and 5] of the Indictment, in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)" (Doc. 149, Jury Interrogatories 4.1 & 5.1). The jury responded "Yes" as to Defendant Rodriguez. (*Id.*). Jury Interrogatories 4.2 and 5.2 asked the jury whether "a machinegun was used, carried, or brandished during and in relation to a crime of violence, or a machinegun was possessed in furtherance of a crime of violence, as charged in [Counts 3 and 5] of the Indictment, in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)" (*id.*, Jury Interrogatories 4.2 & 5.2). The jury again responded "Yes" as to Defendant Rodriguez. (*Id.*).

The jury instructions and verdict form make clear that the jury was properly instructed as to the necessary elements to find Rodriguez guilty of § 924(c)(1)(A), as charged in Counts 4 and 5 of the Indictment.  The jury was also properly instructed, and questioned, as to the additional element necessary to find that a firearm was "brandished" during two separate crimes of violence, in accordance with § 924(c)(1)(A)(ii).  Defendant Rodriguez does not challenge these convictions or jury findings, nor does he argue that the Court's instructions to the jury or the verdict form completed by the jury were in error such that the entirety of his convictions for Counts 4 and 5 must be vacated.  Rather, where the Government charged Rodriguez in Counts 4 and 5 pursuant to § 924(c)(1)(A) *and* § 924(c)(1)(B), Rodriguez's convictions under subsection (A) remain extant.  Thus, because the Court has found that Jury Interrogatories 4.2 and 5.2, and the accompanying jury instructions, omitted the necessary knowledge requirement with respect to the machinegun, only Rodriguez's convictions as to § 924(c)(1)(B)(ii), charged in Counts 4 and 5 must be vacated.[12]

---

[12] This Court's determination that only the conviction for § 924(c)(1)(B)(ii) must be vacated, and not the entirety of Rodriguez's convictions on Counts 4 and 5, is supported by the Third Circuit's Commentary to Instruction 6.18.924B ("Using or Carrying a Firearm During Any Crime of Violence or Drug Trafficking Crime (18 U.S.C. § 924(c)(1)") wherein it instructs that the district court should "provide instructions and special interrogatories regarding those provisions [addressing the involvement of specific firearms such as a machinegun] when they are included in the charges."  The Third Circuit thus makes clear that, while a determination of whether a machinegun was involved in the offense is an element of a § 924(c) offense if charged in the indictment, it is not a necessary element to a finding that a defendant is guilty of § 924(c), but rather is an additional element necessary to find a defendant guilty of the more severe penalty included in § 924(c)(1)(B)(ii).  The convictions under § 924(c)(1)(A) stand separate and apart from the convictions under § 924(c)(1)(B) which must be vacated for a new trial.

The present case is also distinguishable from the First Circuit's decision in *Pérez-Greaux*, where the Circuit Court vacated the entire § 924(c) count and remanded for a new trial on that count.  There,

## V. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendant

Solomon Rodriguez's Motion for a New Trial (Doc. 241) as set forth herein. A separate

Order follows.

Robert D. Mariani
United States District Judge

---

Count 2 of the Superseding Indictment charged Defendant Pérez-Greaux with the knowing possession of a machinegun in furtherance of a drug trafficking crime (*see United States v. Pérez-Greaux*, 3:18-cr-00389-FAB, D.P.R., Doc. 71). The Government did not allege that any other firearm was possessed or used in furtherance of the drug trafficking crime. Here, Counts 4 and 5 of the Indictment charge Rodriguez with the use of multiple firearms, "including a machinegun." (Doc. 1). Thus, unlike in *Pérez-Greaux*, where the defendant could not have been convicted of Count 2 if the jury found that he did not know that the firearm was a machinegun, in the present case, there was ample evidence of several firearms being used during the robberies at issue and, wholly apart from the machinegun interrogatories, the jury found Rodriguez guilty of "possess[ing] a firearm in furtherance of a crime of violence and/or us[ing] or carr[ying] a firearm during and in relation to a crime of violence", (Doc. 149, at 5, 8). Thus, the entireties of Counts 4 and 5 do not need to be vacated.